CARNEY ET AL., APPELLEES, *v.*
KNOLLWOOD CEMETERY ASSN. ET AL.,
APPELLANTS.

(No. 49895 — Decided April 28, 1986.)

*Robert J. Fogarty* and *Patrick Carroll,* for appellees.
*Andrew Buckner,* for appellants.

JACKSON, P.J. Appellants Knollwood Cemetery Association and Robert Smith appeal from a judgment against them in the amount of $56,000. The judgment was rendered in favor of plaintiff-appellees Richard Carney, Katherine Howard, Peter Carney, and Mary Klein.

The factual background of this case is as follows: Dorothy Mallison Carney died in October 1982. Her burial was scheduled for October 25, 1982, in the Mallison family plot at Knollwood Cemetery. The cemetery foreman marked out the perimeter of Dorothy Carney's grave, and a cemetery workman began digging the grave with a backhoe. Unexpectedly, the backhoe bucket uncovered an old wooden vault, called a "rough box." Work was halted and the cemetery superintendent, Robert Smith, was summoned. Smith examined the site, and realized that further digging would destroy at least part of the rough box. Smith was aware that the rough box contained a coffin.

The time for the Carney burial was imminent. Smith instructed the workman to continue digging the grave, and then he left the gravesite. The workmen finished digging, and hauled dirt and debris to a site on the cemetery grounds, where they dumped it in a heap. The Carney burial was then carried out without further incident.

Unknown to the Carney mourners, the final resting place of Dorothy Carney's mother had been disturbed. The rough box encountered by the backhoe operator had contained the remains of Katherine G. Mallison, who was buried in 1929.

Approximately six months later, in March 1983, a Cleveland television station received a tip that skeletal remains had been dumped behind the cemetery. A film crew arrived at the cemetery, and was directed to the dumping ground by cemetery workers, who pointed out the decedent's bones. The police were notified, and a search of the pile uncovered brass handles and a name plate from the coffin of Katherine G. Mallison, along with the

following remains, which the appellants admitted were those of Katherine G. Mallison:

4 sections of skull
2 tibia bones
1 fibula bone
1 piece of pelvic bone
1 piece of clavicle bone
1 piece of femur bone
human hair

A report of this incident was broadcast by the television station, whereupon the appellees discovered that the grave of their ancestor had been disturbed. Appellees Carney, Carney, and Howard are the grandchildren of Katherine G. Mallison. Mary Klein was Katherine Mallison's daughter.[1]

Appellees' amended complaint contained two counts: one sounded in infliction of emotional distress, and the second was premised on the mishandling of a dead body. The case was tried to a jury, which returned verdicts in favor of all appellees, and against both appellants.

On appeal appellants assign four alleged errors by the trial court for review.

### I

Appellants' first assigned error contends:

"The trial court erred, to the prejudice of the defendants, in failing to direct a verdict in favor of the defendants and against the plaintiffs, Richard Carney, Peter M. Carney, Katherine K. Howard and Mary Mallison Klein, at the close of the plaintiffs' evidence on the issue of compensatory damages."

A cause of action for abuse of a dead body has long been recognized in this country. See, e.g., *Brownlee* v. *Pratt* (1946), 77 Ohio App. 533, 537-538, 33 O.O. 356, 358, 68 N.E. 2d 798, 800-801.

"The policy of the law to protect the dead and preserve the sanctity of the grave comes down to us from ancient times, having its more immediate origin in the ecclesiastical law. This salutary rule recognizes the tender sentiments uniformly found in the hearts of men, the natural desire that there be repose and reverence for the dead, and the sanctity of the sepulcher."

The tort of infliction of serious emotional distress, by contrast, is of more recent origin. In *Schultz* v. *Barberton Glass Co.* (1983), 4 Ohio St. 3d 131, 4 OBR 376, 447 N.E. 2d 109, the Supreme Court recognized the existence of a cause of action for the negligent infliction of emotional distress without a contemporaneous physical injury. The Supreme Court held, in *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369, 6 OBR 421, 453 N.E. 2d 666, that one who intentionally or recklessly causes serious emotional distress to another by extreme and outrageous conduct is subject to liability for such emotional distress. This court, in *Pyle* v. *Pyle* (1983), 11 Ohio App. 3d 31, 34, 11 OBR 63, 66, 463 N.E. 2d 98, 103, set forth the following elements of an action for the intentional infliction of serious emotional distress:

"In order to recover on an action for intentional infliction of serious emotional stress four elements must be proved: 1) that the actor either intend-

---

[1] Mary Klein was ninety-five years old and in poor health at the time of trial. She did not testify at trial, because it was not considered practicable to move her from her home in New York state. Subsequent to the jury verdict in this case, Mary Klein died.

ed to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go 'beyond all possible bounds of decency' and was such that it can be considered as 'utterly intolerable in a civilized community,' Restatement of Torts 2d (1965) 73, Section 46, comment d; 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that 'no reasonable man could be expected to endure it,' Restatement of Torts 2d 77, Section 46, comment j. It is not necessary that bodily injury or any physical impact be shown."

In their amended complaint, appellees alleged that the appellants acted in a "willful, wanton, malicious, reckless, and negligent manner."

Appellants readily concede the existence, in the abstract, of both causes of action. Nevertheless, the appellants moved for directed verdicts[2] as to both counts.

*A.* With regard to the emotional distress claim presented in the first count of the complaint, appellants argue that the four descendents of Katherine G. Mallison failed to present evidence that they suffered serious emotional distress after hearing that their ancestor's remains had been disinterred and thrown on a refuse heap. The appellees testified that they were horrified, angry, and saddened, and that they wept and were unable to sleep. None adduced evidence to show

that he incurred expenses for medical or psychological treatment.

Appellants contend that the appellees' evidence was insufficient to make out a case for serious emotional distress, when measured against the "factors" set out in *Paugh* v. *Hanks* (1983), 6 Ohio St. 3d 72, 6 OBR 114, 451 N.E.2d 759, a case involving a series of automobile accidents. Paragraph three of the *Paugh* syllabus states:

"3. Where a bystander to an accident states a cause of action for negligent infliction of serious emotional distress, the emotional injuries sustained must be found to be both serious and reasonably foreseeable, in order to allow a recovery."

The foreseeability factor is further elucidated in Paragraph 3b of the syllabus:

"3b. The factors to be considered in order to determine whether a negligently inflicted emotional injury was reasonably foreseeable include: (1) whether the plaintiff was located near the scene of the accident, as contrasted with one who was a distance away; (2) whether the shock resulted from a direct emotional impact upon the plaintiff from sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) whether the plaintiff and vicitim (if any) were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship."

This court is not convinced that the factors listed therein necessarily con-

---

[2] Civ. R. 50(A)(4) provides:

"When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any deter-

minative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

trol the foreseeability of emotional injury in a case such as the one at bar, in which a grave has been desecrated. Legal authorities have long acknowledged the likelihood of mental anguish resulting from the mishandling of dead bodies. See *infra*. The syllabus law in *Paugh, supra,* does not lay down mandatory requirements, but rather "factors" to be considered in a similar accident case. The syllabus law must be read in the context of "the facts of the specific case before the Court for adjudication." Supreme Court Rule for the Reporting of Opinions 1(B).

Finally, we note the caveat of the Supreme Court in *Paugh* that "the determination in both seriousness and reasonable foreseeability must be accomplished on a case-by-case basis. * * * [N]o fixed or immutable rule is capable of resolving all the cases brought under an action for negligent infliction of serious emotional distress." *Id.* at 80, 6 OBR at 121, 451 N.E. 2d at 767.

The trial court did not err in denying appellants' motion for directed verdict on the first count.

*B.* Regarding the claim for mishandling a dead body contained in the second count of their complaint, appellants argue that only Mary Klein had legal standing to bring the claim, and that consequently a directed verdict should have been granted against the three plaintiffs who were grandchildren of Katherine G. Mallison.

The issue appears to have been waived by appellants. The record discloses that appellants did not raise the standing issue until after the trial had begun.[3] See Civ. R. 12(B) ("Every defense, in law or fact, to a claim for relief in any pleading * * * shall be asserted in the responsive pleading thereto * * *."); see, also, the pre-rule case of *Claxton* v. *Simons* (1963), 174 Ohio St. 333, 22 O.O. 2d 386, 189 N.E. 2d 62, which states that: "The right to object to a person participating as a party in an action is waived if not raised at the earliest opportunity." Nevertheless, we choose to address this issue on its merits.

As indicated previously, there was until recent years no general availability of recovery for infliction of emotional distress without accompanying physical injury. Abuse of dead bodies, however, has received extraordinary treatment in the courts.[4]

---

[3] See Tr. 62:

"THE COURT: Well, as I say, I don't know the answer to it because it was suggested to me now. Again, I'm going to give you the same recommendation that you submit to me briefs on what's going on, what your point is and the — it seems to me — when was this case filed?

"MR. BUCKNER: 1983.

"THE COURT: 1983, and we are now going into 1985, and it seems to me that indeed these defenses or — I don't mean to be putting the burden on the defense, but you are the one making the motion. It seems to me that these things could have been anticipated and not brought while a jury is sitting out in the box.

"I mean, these kind[s] of motions seem to me, to be pretrial motions that should have been ventilated at that time and the Court could have ruled on them."

[4] Prosser, Law of Torts (4 Ed. 1971), at 328-330, provides:

"Where the defendant's negligence causes only mental disturbance, without accompanying physical injury or physical consequences, or any other independent basis for tort liability, there is still general agreement that in the ordinary case there can be no recovery.

"* * *

"In only two groups of special cases has there been any tendency to break away from the settled rule, and to allow recovery for mental disturbance alone. * * * The other group of cases has involved the negligent mishandling of corpses. Here the older rule denied recovery for mere negligence, without circumstances of aggravation. There are by now, however, quite a series of cases allowing recovery for negligent embalming, negligent shipment,

In order to facilitate recovery for the mishandling of a dead body without conceding the existence of a cause of action for emotional distress, the courts have in the past resorted to the fiction of a "quasi-property" interest in the dead body. See *Whitehair* v. *Highland Memory Gardens, Inc.* (W. Va. 1985), 327 S.E. 2d 438, 441:

"The quasi-property rights of the survivors include the right to custody of the body; to receive it in the condition in which it was left, without mutilation; to have the body treated with decent respect, without outrage or indignity thereto; and to bury or otherwise dispose of the body without interference. * * *"

Under the "quasi-property" fiction, a cause of action was recognized which was somewhat analogous to tortious interference with contractual relations. Recovery on the cause of action was generally limited to the person who had the legal right to the disposition of the body. See 4 Restatement of the Law 2d, Torts (1979) 274, Section 868:

"Interference with Dead Bodies

"One who intentionally, recklessly or negligently removes, withholds, mutilates or operates upon a body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body."

This quasi-property approach and the accompanying limitation on recovery have long been discredited. See Note, Damages: Pleading: Property: Who May Recover for Wrongful Disturbance of a Dead Body (1933), 19 Cornell L.Q. 108, 110-111[5]:

---

or running over the body, and the like, without such circumstances of aggravation, which now are in the majority. What all of these cases appear to have in common is an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious. There may perhaps be other such cases. Where the guarantee can be found, and the mental distress is undoubtedly real and serious, there is no essential reason to deny recovery. But cases will obviously be rare in which 'mental anguish,' not so severe as to cause physical harm, will be so clearly a serious wrong worthy of redress, or sufficiently attested by the circumstances of the case." (Footnote omitted.)

See, also, Note, Damages for Mental Suffering Resulting from Mistreatment of a Cadaver, 1960 Duke L.J. 135, 139 ("negligent mutilation or indignity to human remains is sui generis").

[5] The following statements are excerpts from Note, Damages: Pleading: Property: Who May Recover for Wrongful Disturbance of a Dead Body (1933), 19 Cornell L.Q. 108, 110-111:

"If, however, the gravamen of the action is the mental anguish resulting from the act done to the dead body, it would seem that any one who suffered mentally from the act should have a right of action. Almost all of the courts, however, limit the right of suit to the surviving spouse, or if none, to the next of kin. Were the dead body property which would pass by the laws of intestacy, the action might be considered in the nature of the suit in trespass by the owner of the body. But if the plaintiff wins simply because he has suffered mentally there seems to be no basis for a rule that allows one individual a right of action and denies it to another who has essentially identical interests and has suffered equally from the wrong.* * *" (Footnote omitted.)

See, also, Restatement, *supra,* Section 868, at Comment *a:*

"*a.* One who is entitled to the disposition of the body of a deceased person has a cause of action in tort against one who intentionally, recklessly or negligently mistreats or improperly deals with the body, or prevents its proper burial or cremation. The technical basis of the cause of action is the interference with the exclusive right of control of the body, which frequently has been called by the courts a

" 'Quasi property' seems to be, however, simply another convenient 'hook' upon which liability is hung, — merely a phrase covering up and concealing the real basis for damages, which is mental anguish. The plaintiff, in these actions, does not seek to vindicate any 'quasi property' right. He sues simply because of the mental suffering and anguish that he has undergone from the realization that disrespect and indignities have been heaped upon the body of one who was close to him in life." (Footnotes omitted.)

A trend away from the quasi-property fiction is discernible in the case law. In *Scarpaci* v. *Milwaukee County* (1980), 96 Wis. 2d 663, 672, 292 N.W. 2d 816, 820-821, the court stated:

"The law is clear in this state that the family of the deceased has a legally recognized right to entomb the remains of the deceased family member in their integrity and without mutilation. Thus the next of kin have a claim against one who wrongfully mutilates or otherwise disturbs the corpse. * * *

"* * *

"The basis for recovery of damages is found not in a property right in a dead body but in the personal right of the family of the deceased to bury the body. The mutilating or disturbing of the corpse is held to be an interference with this right and an actionable wrong.

"The law is not primarily concerned with the extent of physical injury to the bodily remains but with whether there were any improper actions and whether such actions caused emotional or physical suffering to the living kin. The tort rarely involves pecuniary injury; the generally recognized basis of damages is mental suffering."

The court in *Golston* v. *Lincoln Cemetery, Inc.* (Mo. App. 1978), 573 S.W. 2d 700, declined to follow the restriction on standing suggested by Section 868 of the Restatement.[6] Instead, the court held that the plaintiff was "qualified as a member of the deceased's 'immediate family' to join in or bring an action of the nature envisioned by 1 Restatement of Torts 2d, § 46."[7] 573 S.W. 2d at 710.

Appellants' standing theory in the case at bar is premised on the ancient and discredited quasi-property fiction. Appellants argue that the cause of action lies only in the person who is entitled to the disposition of the body. Appellants further argue that the person is identified by R.C. 517.23 ("Disinterment of body buried in cemetery") as the closest next of kin

---

'property' or a 'quasi-property' right. This does not, however, fit very well into the category of property, since the body ordinarily cannot be sold or transferred, has no utility and can be used only for the one purpose of interment or cremation. *In practice the technical right has served as a mere peg upon which to hang damages for the mental distress inflicted upon the survivor; and in reality the cause of action has been exclusively one for the mental distress. * * *"* (Emphasis added.)

[6] In *Golston,* the defendant undertaker had agreed to bury the deceased in a concrete vault. When the deceased's sister visited the gravesite a few months later, "[s]he saw an open hole in the grave site, and could see her sister's body, particularly the left side of her face, with dirt on it. She could also see a hand from about the waist [*sic*] up. Subsequent investigation determined that the grave was, at its deepest depth, thirty-one inches. Heavy machinery driven over the grave had struck the top of the casket, thus exposing the body. There was evidence of erosion; there was no vault. * * *" 573 S.W. 2d at 703.

[7] Section 46 is entitled, "Outrageous Conduct Causing Severe Emotional Distress."

who may make application for disinterment. In the case at bar, appellants contend, only Mary Klein qualified as the closest next of kin under that description.[8]

Even were this court to accept appellants' assertion that Mary Klein was the *closest* next of kin for purposes of R.C. 517.23, that step would not lead this court to conclude that appellees Carney, Carney, and Howard lacked standing to pursue a claim for the mistreatment of their grandmother's remains. Instead, this court rejects the theory that a surviving custodian has quasi-property rights in the body of the deceased, and acknowledges the cause of action for mishandling of a dead body as a subspecies of the tort of infliction of serious emotional distress.[9]

It is unnecessary, however, at this time to define the entire class of family members who are, or are not, eligible to bring such an action, except as pertains to the appellees herein. As to them, we hold that all four appellees, as direct blood descendants of Katherine G. Mallison, had standing to press their claim for the outrageous disturbance of her remains. Accordingly, appellants' standing argument is without merit.

The first assignment of error is overruled.

## II

In their second assigned error, appellants challenge the trial court's overruling of their motion "for directed verdict as to the claim of punitive damages and attorneys' fees presented by the plaintiffs made at the conclusion of all of the evidence in the within action, and in charging the jury on the issue of punitive damages as against the defendants which charge was duly objected to by counsel for the defendant[s]."

The jury awarded $1,000 in compensatory damages to each plaintiff, and $10,000 in punitive damages to each plaintiff, for a total of $44,000.[10] Appellants now contend that the evidence did not support an award of punitive damages.

The evidence at trial disclosed that the backhoe struck the side and top of a rough box. Work was halted until the superintendent, defendant-appellant Smith, could be summoned. Appellant Smith knew that the rough box contained a coffin, and knew that to continue the digging would break open the rough box and disturb its contents. Nevertheless, appellant Smith instructed the cemetery workers to proceed with the digging. He then left the area.

Thus, the evidence supported a finding of the sort of "conscious and

---

[8] But, see, *Tamarkin* v. *Children of Israel* (1965), 2 Ohio App. 2d 60, 61, 31 O.O. 2d 103, 104, 206 N.E. 2d 412, 414 (application for disinterment made by deceaseds' "next of kin, consisting of their brothers and sisters and the husband and children * * *").

[9] Cf. *Schultz* v. *Barberton Glass Co.* (1983), 4 Ohio St. 3d 131, at 135-136, 4 OBR 376, at 380, 447 N.E. 2d 109, at 113:
"'* * * Recovery for emotional distress unaccompanied by a contemporaneous physical injury has been allowed under special circumstances. See *Columbus*

*Finance* v. *Howard* (1975), 42 Ohio St. 2d 178 [71 O.O. 2d 174] (malice on the part of the wrongdoer); *Housh* v. *Peth* (1956), 165 Ohio St. 35 [59 O.O. 60] (right of privacy invaded); *Brownlee* v. *Pratt* (1946), 77 Ohio App. 533 [33 O.O. 356] (right of burial of the dead transgressed). Similarly, those injured by the negligent infliction of serious emotional distress should have the opportunity to recover damages."

[10] The award of $12,000 for attorney fees was stipulated at trial and is not at issue on appeal.

38

deliberate disregard of the interests of others" that is a prerequisite to an award of punitive damages. *Detling* v. *Chockley* (1982), 70 Ohio St. 2d 134, 138, 24 O.O. 3d 239, 242, 436 N.E. 2d 208, 211, quoting Prosser, Law of Torts (4 Ed. 1971) 9-10, Section 2.

Appellant Knollwood Cemetery Association is liable for punitive damages only if the evidence established that it authorized, ratified, or participated in Smith's wrongdoing. See *Trauth* v. *Dunbar* (1983), 5 Ohio St. 3d 68, 71, 5 OBR 123, 126, 448 N.E. 2d 1368, 1371 (C. Brown, J., concurring in part and dissenting in part). See, also, *Gray* v. *General Motors Corp.* (1977), 52 Ohio App. 2d 348, 6 O.O. 3d 396, 370 N.E. 2d 747. After the Knollwood Cemetery Association was apprised of the disinterment of the remains of Katherine G. Mallison and of Smith's role therein, it decided that no disciplinary action against Smith was warranted, and no action was taken against him.

The association's inaction is probative of ratification:

"The fact that an employer retains an employee, after knowledge of the latter's wilful and malicious conduct, tends to prove ratification of the employee's act sufficient to support a verdict against the employer for exemplary damages." *Saberton* v. *Greenwald* (1946), 146 Ohio St. 414, 430, 32 O.O. 454, 460, 66 N.E. 2d 224, 231, quoting 15 American Jurisprudence (1938) 731, Damages, Section 289.

Appellants' second assignment of error is overruled.

### III

In the third assigned error, appellants charge error by the trial court in "[p]ermitting plaintiffs' counsel to introduce evidence as to the existence of liability insurance purchased by the Knollwood Cemetery Association, and in failing to grant the defendants' motion for mistrial after repeated references to the existence of liability insurance and the fact that the defense of Robert Smith was being provided by the insurance carrier for the Knollwood Cemetery Association."

Throughout the trial, appellants' counsel attempted to show that defendant Knollwood Cemetery Association had nothing to do with defendant Smith and that it was not a proper party defendant.

Evid. R. 411 provides:

"Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership or control, if controverted, or bias or prejudice of a witness."

Insurance evidence was admitted on the controverted issue of agency, as contemplated by the drafters of Evid. R. 411. The trial court gave an appropriate limiting instruction. See Evid. R. 105.

Appellants' third assigned error is overruled.

### IV

In its fourth assigned error appellants contend that:

"The jury's award of punitive damages in the amount of forty thousand dollars ($40,000.00) in addition to twelve thousand dollars ($12,000.00) in attorneys' fees is excessive and reflects passion and prejudice on the part of the jury to the prejudice of the defendants."

Based on the evidence adduced at trial, this court is not persuaded that an award of $11,000 per plaintiff is unreasonable. The amount of attorney fees was stipulated at trial.

Appellants' fourth assignment of error is overruled.

All of the assignments of error

having been considered and overruled, the judgment of the trial court is affirmed.

*Judgment affirmed.*

PRYATEL, J., concurs.

NAHRA, J., concurs separately.

NAHRA, J., concurring. I concur separately because I find that the trial court erred by allowing the jury to consider the claim of emotional distress; the plaintiffs failed to establish serious injury or foreseeability.

The plaintiffs failed to establish that their injuries were foreseeable. Paragraph 3b of the syllabus of *Paugh* v. *Hanks* (1983), 6 Ohio St. 3d 72, 6 OBR 114, 451 N.E. 2d 759,[11] established the factors that must be balanced to determine if an injury is foreseeable:

"3b. The factors to be considered in order to determine whether a negligently inflicted emotional injury was reasonably foreseeable include: (1) whether the plaintiff was located near the scene of the accident, as contrasted with one who was a distance away; (2) whether the shock resulted from a direct emotional impact upon the plaintiff from sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) whether the plaintiff and victim (if any) were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship."

The application of these three factors to the evidence demonstrates that as a matter of law an ordinary man under such circumstances should not have foreseen the resulting harm. *Id.*

at 79, 6 OBR at 120, 451 N.E. 2d at 766.

The first factor given by the *Paugh* court is whether the plaintiff was located near the scene of the accident, as contrasted with one who was a distance away. In the instant case, the plaintiffs were not present when the body was disinterred. In fact, they did not become aware of the "accident" until six months had gone by. The second factor is whether the shock results from a direct emotional impact upon the plaintiff from sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. The plaintiffs learned about the event from others after its occurrence. The third factor is whether the plaintiff and victim (if any) were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

The body disinterred was that of Katherine G. Mallison. She was the mother of one plaintiff, and the grandmother of the remaining three plaintiffs. This criterion is dispositive of the claims of Richard and Peter Carney. The evidence indicated that they had never met Katherine G. Mallison because she died over twenty years before they were born. The remaining grandchild, Katherine Howard, did know the decedent for four years when she was a young child. Mary Klein, the remaining plaintiff, was the daughter of Katherine Mallison. The third factor is not clearly dispositive of Klein's and Howard's claim. However, the other factors are not overbalanced by this relationship.

The requirement of serious emotional injury is not met in this case. The *Paugh* court stated at 78, 6 OBR at 119, 451 N.E. 2d at 765:

---

[11] The law regarding negligent as opposed to intentional infliction of emotional distress is at issue in this case. The plaintiffs pled and argued their injuries were due to the defendants' negligence.

"In delineating the standards to guide Ohio courts in reviewing cases seeking damages for the negligent infliction of serious emotional distress, we wish to underscore the element of 'seriousness' as a necessary component required for a plaintiff-bystander in order to sufficiently state a claim for relief. We view the standard of 'serious' emotional distress as being a more reliable safeguard than an 'ensuing physical injury' requirement in screening out legitimate claims. By the term 'serious,' we of course go beyond trifling mental disturbance, mere upset or hurt feelings. We believe that serious emotional distress describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case. *Rodrigues* v. *State* (1970), 52 Haw. 156, 472 P. 2d 509; *Leong* [v. *Takasaki* (1974), 55 Haw. 398, 520 P. 2d 758], *supra; Molien* [v. *Kaiser Foundation Hospitals* (1980), 27 Cal. 3d 916, 167 Cal. Rptr. 831, 616 P. 2d 813], *supra.*"

In the instant case, the three grandchildren testified that they were upset and lost sleep. One testified that she felt physically ill when she learned of the occurrence; another testified that he cried when he learned of the occurrence; the third grandchild testified that he was so upset that it affected his work. None of these plaintiffs sought medical aid, nor did they become debilitated. As a matter of law, these injuries are not "serious" or "debilitating."

Mary Klein, the daughter of Katherine Mallison, did not testify at trial. Her daughter, Katherine Howard, testified that the only indication of emotional distress made by Klein was her comment upon learning of the occurrence: " 'Wouldn't it be better to let memories be.' " This evidence, standing by itself, is insufficient to demonstrate serious emotional injury.

The plaintiffs have proved an independent claim. Desecration of a corpse is a recognized cause of action in Ohio. *Brownlee* v. *Pratt* (1946), 77 Ohio App. 553, 33 O.O. 356, 68 N.E. 2d 798. The defendant premised its defense to this action on two points: the standing of the plaintiffs to recover, and the argument that a separate corporate entity, not named in this action, was the responsible party.

The challenge to the plaintiffs' standing was not made in a timely manner. Standing is an affirmative defense. Civ. R. 8(C). The failure to plead an affirmative defense constitutes a waiver. *Houser* v. *Ohio Historical Society* (1980), 62 Ohio St. 2d 77, 16 O.O. 3d 67, 403 N.E. 2d 965. The court correctly allowed the jury to consider all of the claims.

The appellants' second defense at trial is not raised on appeal.

The plaintiffs presented a prima facie case of desecration of a grave. It was within the jury's purview to render a verdict for the plaintiffs on this claim.

The jury rendered a general verdict for plaintiffs. This verdict is presumed to have been returned on the viable claim. *Sites* v. *Haverstick* (1873), 23 Ohio St. 626; *McCarthy* v. *Kasperak* (1981), 3 Ohio App. 3d 206, 3 OBR 234, 444 N.E. 2d 472. Therefore, I concur in the court's affirmance of this judgment.

I concur with the majority's reasoning relative to the award of punitive damages. I write separately to emphasize the facts that underlie the award.

Conflicting testimony was presented at trial concerning the disinterment of Katherine Mallison. Three grave diggers testified, presenting a consistent story. However, the super-

visors, who were present, gave a different story; the choice between these versions was the jury's.

The grave diggers presented the following scenario. They were assigned to dig Dorothy Mallison Carney's grave in the Mallison family plot. Her grave was to be between her husband's and her mother's (Katherine Mallison's). The grave diggers began at 11:30 a.m.; the grave had to be ready when the funeral arrived at about 2:00 p.m. They stopped when the grave was partially dug because they hit a rough box containing the coffin and remains of Katherine Mallison. The backhoe they were using had a thirty-six-inch wide shovel. They testified that when they stopped digging, they could see the top of the rough box protruding a foot into the grave. The grave was three feet wide and of this three feet, one foot was taken by the rough box. The grave they were digging was between two others; each grave is allotted a forty-inch width. The grave could not be moved a foot to the other side to avoid the rough box because it would have hit the adjoining grave.

The grave diggers called their supervisors, the foreman, Walker, and the superintendent, Robert Smith, at about 11:45 a.m., when they struck the rough box. It is uncontroverted that the rough box was undamaged at this point.

The grave diggers took a one-half hour lunch break from 12:00 p.m. to 12:30 p.m. When they returned to the grave site, Smith and Walker were still there pondering what to do. At about 1:00 p.m., they told the grave diggers to finish the grave. Smith is reported to have said: "It [the rough box] shouldn't be there, * * * go ahead and have the men dig it out."

In the scenario outlined by grave diggers, it was inevitable that the remains of Katherine Mallison would be disturbed by using the backhoe to dig the remainder of Dorothy Carney's grave.

The grave diggers testified that Walker stood by the grave and watched the wooden fragments of the rough box being scooped out of the grave and loaded into a dump truck. When the grave was dug, he told the truck operator to dump the dirt from the grave in the far back.

Smith left after ordering the grave to be completed; however, he did not leave the area. The grave diggers testified that he drove his truck onto a nearby road and parked. He watched the digging of the grave from this vantage point.

If the jury believed the grave diggers, they may have concluded that Smith and Walker decided to complete the grave the workers were digging, prior to the arrival of Dorothy Carney's funeral, even if it meant disinterring her mother. They then permitted her remains to be dumped with other refuse from the grave in a remote area of the graveyard, where the remains would have remained if an informant had not alerted the media.

The jury's failure to sanction this behavior was within its discretion. Its award cannot be said to be the result of passion and prejudice.