**MIDTOWN HOSPITAL, et al., Plaintiffs,**

v.

**Zell MILLER, et al., Defendants.**

**No. Civ.A. 1:97–CV–1786–JOF.**

United States District Court,
N.D. Georgia,
Atlanta Division.

July 24, 1997.

Lauren L. Becker, Atlanta, GA, Kathryn Kolbert, Julie Kay, Simon Heller, The Center for Reproductive Law & Policy, New York City, Elizabeth Joan Appley, Atlanta, GA, for plaintiffs.

William C. Joy, Jeff L. Milsteen, Shalen A. Sgrosso, Stephanie Marie Baldauff, Office of State Attorney General, Atlanta, GA, for defendants.

## ORDER OF THE COURT

FORRESTER, District Judge.

This action, brought pursuant to 42 U.S.C. § 1983, is before the court on Plaintiffs' application for a temporary restraining order seeking to restrain the enforcement of a new Georgia statute regulating the circumstances under which certain procedures may be used to effect an abortion [5–1]. It is contended that this statute is void for vagueness and, further, that it violates the substantive due process rights of women to control their reproductive processes under principles first

announced in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

The new statute, Senate Bill 357 (hereinafter the "Act"), became effective on July 1, 1997. Immediately prior to that date this court entertained oral arguments from the parties. The court now DENIES the motion for a temporary restraining order for the reasons stated herein except to the extent previously granted. *See Midtown Hospital et al. v. Miller,* Civil Action No. 1:97–CV–1786–JOF (N.D.Ga. June 27, 1997).

## I. THE STATUTORY FRAMEWORK

Prior to the enactment of the Act, the law of Georgia provided in relevant part:

(c) No abortion is authorized or shall be performed after the second trimester unless the physician and two consulting physicians certify that the abortion is necessary in their best clinical judgment to preserve the life or health of the woman. . . .

O.C.G.A. § 16–12–141. The Act amends O.C.G.A. § 16–12–141(a) and adds a new section, O.C.G.A. § 16–12–144, which provides in pertinent part:

(b) Any person who knowingly performs a partial-birth abortion and thereby ends the life of a human fetus shall, upon conviction thereof, be punished by a fine not to exceed $5,000.00, imprisonment for not more than five years, or both. This prohibition shall not apply to a partial-birth abortion that is necessary to save the life of the mother because her life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering condition caused by or arising from the pregnancy itself, provided that no other medical procedure will suffice to save the mother's life.

In its Definitions, the new section states that: "(2) 'Partial-birth abortion' means an abortion in which the person performing the abortion partially vaginally delivers a living human fetus before ending the life of the fetus and completing the delivery." O.C.G.A § 16–12–144(a)(2).

Further, the new section creates a right of action in the father of the fetus and, if the mother has not attained the age of eighteen, in the maternal grandparents of the fetus.

O.C.G.A. § 16–12–144(c). A civil action is barred, however, if the pregnancy resulted from the plaintiff's criminal conduct or if the plaintiff consented to the abortion.

The Attorney General for the State of Georgia contends to this court that the statute applies only in deliveries of viable fetuses, and the court believes that is the proper construction of the term *"living* human fetus." (Emphasis added).

## II. MATERIAL FACTS

According to the affidavits and the argument of counsel, there are at least seven procedures available to a physician to effect an abortion after the fetus has developed to the stage of viability. They are a hysterotomy (a pre-maturity caesarian section), a hysterectomy, induction methods, a post-mortality dilation and evacuation (hereinafter "D & E"), a post-mortality dilation and extraction (hereinafter "D & X"), and D & E and D & X performed before causing the demise of the fetus.

The D & E procedure begins with a forcible dilation of the cervix. After the cervix is dilated, the physician fishes out one leg of the fetus and then the other and proceeds to cut the fetus apart, removing it in portions. D & X is a more recent procedure. It is sometimes referred to as an intact D & E procedure. This method begins as does the D & E. The physician delivers intact so much of the fetus as is possible. Scissors are then inserted through the patient's vagina to the cervix where the physician endeavors to make an opening at the base of the fetal skull. The brains of the fetus are then extracted by suction. The intact fetus can be removed because the head can now be compressed or crushed. Before performing either a D & E or D & X procedure, a physician may inject various drugs or chemicals into the fetal cardiac muscle and thereby cause its demise prior to delivery.

The court understands that, in practice, no late term abortions have been performed by any of the parties before the court without causing pre-procedure demise of the fetus. It also is represented to the court that no third trimester abortions have been per-

formed in the State of Georgia during the past two years.

## III. CONCLUSIONS OF LAW

### A. *Void for Vagueness*

■ The physicians and health provider Plaintiffs first contend that the Act is void for vagueness and therefore must fail. They contend that the term "partial-birth abortion" has no fixed meaning in the medical community and that, therefore, Plaintiffs are not told the performance of which procedures will subject them to criminal penalties. Their difficulty stems from a reading of the Act so as to make it apply to pre-viability abortions and from a perception that the Act was meant to apply only to the D & X procedure when in fact it may also apply to the D & E procedure. The Georgia General Assembly chose to define partial-birth abortions in terms of a "living" fetus. In the context of the jurisprudence in this area, such a phrase can only mean "viable." As a result, the court cannot find a lack of notice as to whether the statute applies to post-viability abortions. Further, of course, the court must prefer the interpretation which will uphold the statute, and this interpretation provides the greatest opportunity to do that. *High Ol' Times, Inc. v. Busbee,* 673 F.2d 1225, 1229 (11th Cir.1982). Moreover, the statute is not void for lack of further definition about when a fetus becomes living or viable. That point in the development of a fetus was thought to be of sufficient precision by the Supreme Court in *Planned Parenthood v. Casey,* 505 U.S. 833, 870, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

■ Plaintiffs next contend that the Act is vague because it could in some circumstances cover the D & E procedure as well as the D & X procedure. The evidence before the court suggests that partial vaginal delivery may occur in both procedures, and it is indeed quite possible that the Act may be applied to both. However, any confusion that the Plaintiffs suffer is more likely the product of supposing that the General Assembly intended only to address the D & X procedure. The fact that the plain words of the statute can cover another procedure does not mean that it does not provide notice of

what conduct it makes subject to criminal sanctions.

Therefore, the court concludes that there is very little chance of success on the merits on the contention that the statute is void for vagueness. Accordingly, no temporary restraining order is warranted on this point.

### B. *Substantive Due Process*

### 1. *Irreparable Injury*

■ The physicians also derive standing from the substantive due process rights conveyed upon American women in *Roe. See Roe,* 410 U.S. at 153, 93 S.Ct. 705. Even if the court were to assume that potential abortion patients have rights derivative of *Roe* to have abortions after the fetus is viable, the physicians and health care providers at bar must still demonstrate that a temporary restraining order is necessary to prevent irreparable injury to these potential patients. *Ingram v. Ault,* 50 F.3d 898, 900 (11th Cir. 1995) (citation omitted). The Plaintiffs' requested relief is a drastic remedy that is not to be granted unless they clearly carry the burden of persuasion on four elements of which the threat of irreparable injury is one. *See Northeastern Fla. Chapter of Ass'n of Gen. Contractors of Am. v. Jacksonville, Fla.,* 896 F.2d 1283, 1285 (11th Cir.1990) (citations omitted). That case also stands for the proposition that injunctions before trial that infringe on legislative enactments should be granted reluctantly and only when the Constitution and equity require them, "because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits." *Id.* at 1285.

■ Given the record before the court that no third trimester abortions have been performed in Georgia in the past two years and that physicians can continue to employ D & E and D & X techniques in appropriate cases after they first cause the demise of the fetus, there is absolutely no likelihood that the requirements of the statute would create any substantial impediment to the exercise of any vestigial liberty interest created by the Supreme Court in *Roe.* Consequently, this court concludes that Plaintiffs have not shown that they would suffer irreparable in-

jury if their motion for an injunction were denied.

### 2. Success on the Merits

■ Another one of the elements that Plaintiffs must show in order to obtain temporary relief is a substantial likelihood that they will ultimately succeed on the merits of the case. *Ingram,* 50 F.3d at 900. Plaintiffs have failed to make such a showing in the case at bar.

■ To determine the likelihood of success on the merits, one must discover the nature of the right created in *Roe* and the duration of that right. The Georgia statute in question creates rights and imposes regulations that ordinarily would be well within the permissible scope of state action. Plaintiffs argue that *Roe* furnishes the rules of decision even in post-viability cases and that this court should interpret *Roe* in the present case with the same preemptive breadth that the court would in pre-viability cases. If this position is correct, plaintiffs might well prevail on the merits. Based on subsequent Supreme Court treatment and logic, however, it seems to the court that a pregnant woman's liberty interests cease to be *sui generis* at viability. After that point, the court believes that the respective rights of the woman, the state, and others are defined by more traditional, general rules.

From the beginning, *Roe* described the right in question as one of privacy in the woman to allow her to decide whether or not to terminate her pregnancy, but that right has never been thought to be an absolute one. *Roe,* 410 U.S. at 153, 93 S.Ct. 705. The Court in *Roe* recognized a continuing right in the state to regulate abortions, provided that the regulations are tailored to recognized state interests. *Id.* at 165, 93 S.Ct. 705. In *Roe,* Justice Blackmun wrote:

> For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate and even proscribe, abortion ex-

cept where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.

*Id.* at 164–65, 93 S.Ct. 705. Although this statement is dicta, it may be fairly argued from this that Justice Blackmun thought that the right created in *Roe,* though variable in strength, lasted throughout the gestation period.

If a pregnant woman has a unique liberty interest to protect her life or health derived from *Roe,* it is to be found in *Thornburgh v. American College of Obst. & Gyn.,* 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986). In that case, the Court struck down a Pennsylvania statute that did not contain an emergency exception to certain fetal survivability provisions if it was necessary to protect the life of the mother. *Id.* The Supreme Court found the Pennsylvania statute unconstitutional because the statute required the mother to bear an increased medical risk in order to save her viable fetus. *Id.* at 769–71, 106 S.Ct. 2169.

However, it is doubtful that *Thornburgh* correctly expresses the view of the Supreme Court on the reach of the right created in *Roe* at the present time. In the plurality opinion in *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), Justice O'Connor wrote in part:

> We conclude that the basic decision in *Roe* was based on a constitutional analysis which we cannot now repudiate. The woman's liberty is not so unlimited, however, that from the outset the State cannot show its concern for the life of the unborn, and at a later point in fetal development the State's interest in life has sufficient force so that the right of the woman to terminate the pregnancy can be restricted.... We conclude the line should be drawn at viability, so that before that time the woman has a right to choose to terminate her pregnancy.

*Casey,* 505 U.S. at 869–70, 112 S.Ct. 2791.[1] This is a Supreme Court recognition of the

---

1. There is a question about the precedential value of *Casey,* which as said is only a plurality opinion. The Chief Justice along with Justice Scalia and Justice Thomas dissented from the plurality opinion because they would have overruled *Roe* outright. Justices Kennedy and Souter joined with Justice O'Connor in the plurality

opinion. The plurality opinion disregards the trimester approach of *Roe* and outright overrules portions of *Thornburgh* and *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983). Though only a plurality decision, it seems clear to this court that there are six justices that, for different rea-

dichotomous nature of the liberty interest created by *Roe* —and to this court, it is the only logical understanding of that liberty interest.

It is suggested that it is a logical impossibility to say that the rights created in *Roe* exist in the post-viability stages. Either the woman has a liberty interest which entitles her, free of any judgment that the state or the father might make about issues either of morality or maternal obligation, to sculpt her destiny and define her role by the exercise of discretion to terminate a pregnancy, or she does not. Once the state is empowered to proscribe abortions, however, any liberty interest in humanistic self-determination is extinguished.

Further, if the libertarian style rights of *Roe* are said to persist at the post-viability stage, then it would seem to follow that any state regulation that might interfere with the judgments of the woman and her physician about what is necessary to protect life or health would have to be very narrowly tailored. It would also seem to follow that the state would not have the power to regulate health care considerations to the degree to which it routinely does for all other citizens. As this court does not believe that the Supreme Court would accord a pregnant woman more determinism in matters of life or health than it would accord to a woman who was not pregnant, it believes that Justice Blackmun's statement quoted above only affirms general substantive due process notions and does not create new ones.

As said, a woman in Georgia may still obtain an abortion after viability if it is needed to protect her life or health. The Act under attack allows the use of five procedures [2] and prohibits access only to two procedures which still may be used if they are:

> ... necessary to save the life of the mother because her life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering condition caused by or arising from the pregnancy itself, provided that no other medical procedure will suffice to save the mother's life.

O.C.G.A. § 16–12–144(b). The question therefore becomes whether a citizen has a right to a particular medical procedure.

■■ As Plaintiffs correctly point out, all Americans have a right to refuse medical treatment. *Riggins v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992); *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). We live in a modern, highly-regulated society where it is thought that government has a highly compelling interest not only in the protection of life but also in the regulation of the medical profession and the pharmaceutical industry. Courts have regularly held that a citizen has no liberty interest in obtaining a particular medical procedure or a particular drug. *See Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); *Rutherford v. United States,* 616 F.2d 455 (10th Cir.), *cert. denied,* 449 U.S. 937, 101 S.Ct. 336, 66 L.Ed.2d 160 (1980) (terminally ill cancer patients seeking access to laetrile); *Carnohan v. United States,* 616 F.2d 1120 (9th Cir.1980) (same); *Mitchell v. Clayton,* 995 F.2d 772 (7th Cir.1993) (patients seeking treatment by unregulated acupuncturists); *New York State Ophthalmological Soc. v. Bowen,* 854 F.2d 1379 (D.C.Cir.1988) (cataract removal patients seeking to have assistant surgeon present during surgery), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2448, 104 L.Ed.2d 1003 (1989); *England v. Louisiana State Bd. of Medical Examiners,* 259 F.2d 626 (5th Cir. 1958) (per curiam) (States may not unreasonably outlaw medical treatments); *see also Sammon v. New Jersey Bd. of Medical Examiners,* 66 F.3d 639 (3d Cir.1995) (noting that rational basis review applies to State restrictions on treatment choices).

At this early stage of the litigation, the court understands that at least one state interest which the Act seeks to serve is to protect the viable fetus from death by a "particularly gruesome" procedure. (Aff. of R. Don Gambrell, Jr., M.D., Defendants' Preliminary Response to Plaintiffs' Motion for Temporary Restraining Order). Courts tra-

---

sons, would support the rethinking of the former, more expansive jurisprudence set forth in *Roe.*

2. These five procedures include hysterectomy, hysterotomy, induction, and the D & X and D & E procedures where fetal demise is caused before delivery.

ditionally have dealt delicately with conceptualizations of the fetus, talking about it only in terms of potential life. Courts also have acknowledged the theological and philosophical debates about when life begins, which implicate watershed issues that have made it difficult to discuss secular notions of liberty and common sense notions of life. The fact is that after a fetus becomes viable, further development in utero is merely one possible environment for the growth of a being who has developmental peers in neonatal units almost everywhere. There is no question that the state has an interest in protecting the dignity and welfare of this peer group of fully delivered children. *See Jehovah's Witnesses v. King County Hosp.*, 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968) (per curiam), *aff'g*, 278 F.Supp. 488 (W.D.Wash. 1967) (three-judge court); *Prince v. Massachusetts*, 321 U.S. 158, 166–67, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

■■■ As surely as a court can limit state action that is shocking to the conscience, brutal, or offensive to human dignity in aid of carrying out the criminal laws of this country, *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), a state can outlaw private conduct that is similarly offensive. There is no doubt that the standards of decency held by a civilized society would permit no state in the union to execute the most heinous murderer utilizing the procedures of D & E and D & X. *See Gregg v. Georgia*, 428 U.S. 153, 175, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Furman v. Georgia*, 408 U.S. 238, 264–65, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring). It seems clear, then, that the state has a legitimate and compelling interest in regulating the manner in which abortions are performed after the fetus is viable.

The section of the Act on which Plaintiffs have the best chance of prevailing is as follows:

(c)(1). The father of the fetus, and the maternal grandparents of the fetus, if the mother has not attained the age of eighteen years of age at the time of the abortion, may obtain appropriate relief in a civil action unless the pregnancy resulted from the plaintiff's criminal conduct or the plaintiff consented to the abortion.

(2). Such relief shall include:

(A) Money damage for all injuries, psychological and physical, occasioned by the violation of this code section; and

(B) Statutory damages equal to three times the cost of the partial birth abortion.

O.C.G.A. § 16–12–144. This section creates considerable practical tension. Those who would argue for the most wide-ranging application of *Roe* do so at least in part out of a perception that true freedom of choice in reproductive matters means that a woman will not be made by the state to be subjugated to the judgments either of her husband[3] or her parents. Were a court able to say that the rights of reproductive freedom recognized in *Roe* continued past viability, protecting these aspirations would certainly provide a reason for a court to invalidate this section of the statute. Indeed, in pre-viability cases, the Court has given the husband no standing, *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), and has narrowly circumscribed the circumstances under which a state may require a minor to obtain parental consent. *Akron v. Akron Center for Reproductive Health*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983).

The case at bar presents itself differently. If the Act is upheld, this provision will not interfere with a woman's liberty to choose to terminate her pregnancy for twenty or so weeks. The clause creating interests in third parties even in post-viability cases would not create a right of action in third parties unless two particularly gruesome and inhuman procedures were employed, and even then the procedures may be used under certain circumstances. It seems to this court that this structure accords a rather full measure of freedom to the pregnant woman.

While this court believes that the reach of *Roe* cannot logically invalidate these provisions, the court assumes that an argument could be made that other substantive due

3. The court does not see the Act as providing a right of action for fathers of children born out of wedlock because fornication and adultery are both crimes in Georgia. *See* O.C.G.A. § 16–6–18 (fornication); O.C.G.A. § 16–6–19 (adultery).

process rights might prohibit a state from arbitrarily setting up barriers to access to medical procedures. The question therefore becomes whether any barriers created by the state are related to rational state interests.

In this section of the Act, the Georgia General Assembly has created a specific right of action akin to those of the torts of outrage or infliction of emotional harm. To many, a post-viable fetus is a virtual child. To husbands and grandparents it has an identity often defined by a knowledge of gender, size, and personality communicated by patterns of activity. Close relatives of the virtual child understand that it has a reasonable opportunity for survival in a neonatal clinic. Said another way, they can have a rational and deep emotional attachment to it.

At common law, these husbands and grandparents never had a right to recover for the wrongful death of a child even after delivery. However, the common law did recognize a right to recover for mental anguish caused by the mishandling and mutilation of dead bodies. *See, e.g., Carney v. Knollwood Cemetery Ass'n.*, 33 Ohio App.3d 31, 514 N.E.2d 430, 433 & n. 4 (1986); *Spiegel v. Evergreen Cemetery Co.*, 117 N.J.L. 90, 186 A. 585 (1936). The right initially was grounded in a "quasi-property" interest in the body, and actions pursuant to it could only be brought by the person who had the legal right to the body's disposition. *Carney*, 514 N.E.2d at 434 (citing 4 Restatement (2d) of Torts, § 868 (1979)); *Spiegel*, 186 A. at 586. Later, however, some courts began to recognize that the recovery for mishandling of a corpse was in reality solely for mental anguish and was not due to the injury to any separate "quasi-property" right. *See Carney*, 514 N.E.2d at 434–36; *Strachan v. JFK Memorial Hosp.*, 109 N.J. 523, 538 A.2d 346, 350 (1988). As a result, these states began to broaden the class of those who could recover for emotional trauma caused by such outrageous conduct to cover family and close blood relatives. *See Carney*, 514 N.E.2d at 436.

Furthermore, states have also adopted statutes allowing for close relatives who view an injury to a family member to recover for the negligent infliction of emotional distress. These statutes vary in their requirements, with some requiring that the plaintiff suffer some physical harm as well as mental distress, some requiring that the plaintiff be placed in some danger by the defendant's conduct, and some merely requiring that the mental suffering be foreseeable. *See Johnson v. Ruark Obstetrics and Gynecology Associates, P.A.*, 327 N.C. 283, 395 S.E.2d 85, 88–89 (N.C.1990) (discussing various state laws). Most states have limited recovery to close family members, and in some states, grandparents have been included in that class. *See, e.g.*, La.Civ.Code Ann. art. 2315.6 (West 1996); *Thing v. La Chusa*, 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814, 830 (1989); *Genzer v. City of Mission*, 666 S.W.2d 116 (Tex.App.1983).

It is a function of states to provide remedies for civil wrongs, and the type recognized in this Act is of a type that has been recognized in other states, though not in an abortion context. The rights recognized in the Act are not new to physicians or medical providers, and the procedures for which suit can be brought are sufficiently narrowly tailored that at this stage it appears to the court that substantive due process considerations are satisfied.

## IV. CONCLUSION

Because there is no threat of immediate irreparable injury and because it is unlikely that the Plaintiffs will prevail on the merits, the motion for a temporary restraining order is DENIED except to the extent previously granted as indicated *supra*. The parties are hereby instructed to contact the deputy clerk to arrange a conference with the court at which the court will establish future scheduling deadlines for the resolution of this action.

SO ORDERED.

## *ORDER*

This case is before the court on the parties' proposed consent order.

This civil rights action was brought by Plaintiffs, two doctors and four medical facilities, to challenge the constitutionality of a new Georgia statute, codified at O.C.G.A. §§ 16–12–141 and 16–12–144, regulating the circumstances under which certain procedures may be used to effect an abortion ("the

Act"). Plaintiffs have named as Defendants Gov. Zell Miller, the Governor of Georgia, Mr. Thurbert Baker, the Attorney General of Georgia, and Mr. Paul Howard, the Fulton County District Attorney. Plaintiffs contend in the complaint that the Act is void for vagueness and, further, that it violates the substantive due process rights of women to control their reproductive processes. The complaint seeks preliminary and permanent injunctive relief preventing Defendants from enforcing the Act and a declaratory judgment that the Act is unconstitutional.

The Act took effect on July 1, 1997. Immediately prior to that date, on June 26, 1997, the court entertained oral arguments from the parties on Plaintiff's motion for a temporary restraining order enjoining the enforcement of the Act. Subsequent to this hearing, on June 27, 1997, the court entered an interim order limiting any enforcement of the Act to abortions involving post-viable fetuses. Thereafter, the court entered a ruling on Plaintiff's motion for a temporary restraining order. This order reaffirmed the relief granted in the interim order but declined to expand the scope of this restraining order.

Then, on March 24, 1998, the court entered an order which granted in part and denied in part Plaintiff's motion for a preliminary injunction by extending the partial relief granted in the court's prior ruling regarding the motion for a temporary restraining order. The court's March order also denied Plaintiff's motion to certify a defendant class composed of the District Attorneys from all of the counties in Georgia and denied a motion to stay proceedings pending the Supreme Court's certiorari decision in *Voinovich v. Women's Medical Professional Corp.*, —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998). The parties were then directed to file a consolidated pretrial order, and the case was set for a permanent injunction hearing on July 7, 1998.

Prior to the date of this hearing, the parties presented to the court the instant consent order which proposes to settle the claims in this action. A hearing was held

before the court on July 7, 1998 regarding the proposed order, and the court took the matter under advisement. On August 11, 1998, the court held a conference call with the parties and directed them to notify the Speaker of the Georgia House of Representatives and the President of the Georgia Senate of the proposed settlement and allow these representatives of the Legislature two weeks to intervene and object to the settlement. That time period has now expired, and no attempt to intervene has been made.

The stipulation submitted by the parties provides that the Defendants and their successors in office will enforce the Act only as to abortions performed after the point of viability, that the term "living human fetus" as used in the Act shall mean "viable human fetus,"[1] and that the Act applies only to abortions in which an "intact dilation and extraction" abortion procedure which contains certain elements is used. These elements are: the deliberate dilation of the cervix, usually over a sequence of days; instrumental conversion of the fetus to a footing breach; breech extraction of the body excepting the head; and partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead, but otherwise intact, fetus. Finally, the stipulation states that under current Georgia law, abortions are not prohibited that are necessary to preserve a woman's life or health. Further, the parties are to bear their own attorneys' fees and costs.

■ In determining whether to approve this stipulation, and consequently dismiss this case, the court must assess the authority of the Defendants to so bind the state. A similar issue has been addressed by courts in this circuit when adjudicating challenges brought under the Voting Rights Act. For example, in *Brooks v. State Board of Elections*, 848 F.Supp. 1548 (S.D.Ga.1994), Judge Edenfield addressed a proposed settlement in a case challenging the system of electing state judges in Georgia. In *Brooks*, the court found that the Governor and the Attorney General had the power to settle the case.

---

1. The stipulation also provides that "viable human fetus" shall mean, for the purposes of an order entered by the court, a fetus that has

reached that point in gestation at which the fetus has a reasonable chance of sustained survival outside the womb of the pregnant woman.

*Id.* at 1562. The court stated that this power is inherent n the duty of the Attorney General to represent the State. This power, according to the court in *Brooks*, however, is limited by the fact that the Attorney General cannot settle in contravention of the wishes of his clients of in the contravention of the law.

It is this limitation that caused the court in *Brooks* to disapprove the settlement before it. Although the settlement was not in contravention of the wishes of the Attorney General's clients, the court found it to be in contravention of the law. The proposed settlement would have changed the system of selecting state judges from a system of election of judges in the state constitution, and that the defendants in that case could not alter that constitutional provision without going through the formal amendment process. *Id.* at 1564, 1568.

In the instant case, as in *Brooks*, there is no question of this settlement being in contravention of the wishes on the Attorney General's clients. It is clear that the parties involved all support the settlement. Here, however, the question of whether the proposed settlement violates the law is less clear than it was in *Brooks*. The instant settlement does not purport to alter the provisions of the state constitution, but instead seeks to set forth a binding interpretation of a state statute. In such a case, the court finds the reasoning of Judge Thompson in *White v. State of Alabama*, 867 F.Supp. 1519 (M.D.Ala.1994), more persuasive.

In *White*, a challenge under the Voting Rights Act was brought to the at-large system of electing Alabama appellate judges. In ruling on a proposed settlement in that case, the court again noted that it was clear that the Attorney General had the authority to settle a case when the settlement did not contravene state law as a part of his or her general authority to control litigation on behalf of the state. The court went on to note, however, that the Attorney General could settle a suit which conflicted with state law if the state law in question violated federal law. This is because the Supremacy Clause invalidates state laws which conflict with an Act of Congress, and in such a case it is the duty of the Attorney General to uphold the federal law. Thus, a settlement which was in accord with the federal law would be one method of fulfilling this duty and would save the time and resources which would have been spent on a trial. *Id.* at 1541.

Under this same reasoning, the Attorney General may settle a case which arises from a god faith federal challenge to a state law without admitting that the law violates federal law. As long as there is sufficient evidence to show that the challenge to the state law is reasonable, it is consistent with the Attorney General's duties to allow him or her to determine that it is in the interests of the state to save the expense of litigation by settling the controversy. *Id.*;[2] *see also Armstrong v. Adams*, 869 F.2d 410 (8th Cir.1989) (finding that election commissioners had the power to enter into à settlement providing for a new election despite the fact that they could not call an election under state law); *Lawyer v. Dept. of Justice*, 521 U.S. 567, 117 S.Ct. 2186, 2192, nn. 4 & 5, 138 L.Ed.2d 669 (1997) (affirming the district court's decision to approve a settlement in a voting rights case despite the lack of a finding of unconstitutionality and noting the broad discretion of the state attorney general to enter into a settlement).

In the instant case, as in *White*, although the court has not made a specific finding of unconstitutionality, the court does find that Plaintiff presents a colorable constitutional argument as to the illegality of the Act. Accordingly, it appears to the court that the Defendants here have the authority to enter into the proposed stipulation. In such a case, it does not appear to serve the interests of the parties in this case, or those of the court, to proceed to unnecessarily adjudicate constitutional issues.

---

**2.** The district court's approval of the proposed settlement in White was overturned by the Eleventh Circuit. The reversal, however, was based upon a finding that the settlement itself violated the Voting Rights Act—the very federal law it was meant to comply with. The Eleventh Circuit expressly declined to comment on the district court's findings on the Attorney General's authority or any possible separation of powers concerns posed by the settlement. See *White v. State of Alabama*, 74 F.3d 1058 (11th Cir.1996).

**1370**

This is especially true in light of the fact that representatives of the Georgia Legislature have been given an opportunity to intervene and object to the settlement and declined to do so. This tacit approval of the settlement goes far in allaying concerns regarding the implications of such an agreement on the separation of powers between the branches of the Georgia Government and the effect of that separation on the binding nature of the stipulation. In addition, it appears to the court that the proposed stipulation agreed upon by the parties narrowly construes the Act in such a way as to comport with the intent of the Legislature. Accordingly, the court hereby APPROVES the stipulation.

SO ORDERED.