**Jacqueline CHESHER, et al., Plaintiffs,**

v.

**Tom NEYER, et al., Defendants.**

**No. 1:01–CV–00566.**

United States District Court, S.D. Ohio, Western Division.

Sept. 29, 2005.

Renee Ann Infante, Stanley Morris Chesley, Terrence Lee Goodman, Paul M. De Marco, Waite Schneider Bayless & Chesley Co LPA, Jennifer Lynn Branch, Alphonse Adam Gerhardstein, Gerhardstein Branch & Laufman Co. LPA, Cincinnati, OH, for Plaintiffs.

Jamie M. Ramsey, Louis Francis Gilligan, Keating Muething & Klekamp, Stephen James Patsfall, Stephen Michael Yeager, Patsfall Yeager & Pflum LLC, Marc David Mezibov, Mezibov & Jenkins, LLP, Michael N. Budelsky, Glenn Virgil Whitaker, Michael L. Rich, Vorys Sater Seymour & Pease, Lawrence Edward Barbiere, Schroeder Mundrell Barbiere & Powers, Cincinnati, OH, for Defendants.

## OPINION AND ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on the Motion for Summary Judgment of Defendant Carl L. Parrott, Jr., M.D. (hereinaf-

ter "Parrott") (doc. 315), Motion for Summary Judgment of Defendants Hamilton County, Ohio, Terrence Daly, Ronda Gros, Robert Pfalzgraf, M.D., and Gary Utz, M.D. (hereinafter "County Defendants") (doc. 321), Defendant Thomas Condon's (hereinafter "Condon") Motion for Summary Judgment (doc. 325), Defendant Jonathan Tobias, M.D.'s (hereinafter "Tobias") Motion for Summary Judgment (doc. 327), Plaintiffs' Memorandum in Opposition to Defendants' Various Motions for Summary Judgment on State–Law Claims (doc. 332), Parrott's Reply Memorandum in Support of Motion for Summary Judgment (doc. 334), the County Defendants' Reply in Support of Motion for Summary Judgment (doc. 338), Condon's Reply Memorandum in Support of Motion for Summary Judgment (doc. 335), and Tobias' Reply in Support of Motion for Summary Judgment (doc. 336).

## FACTS AND PROCEDURAL HISTORY

Plaintiffs' Amended Complaint, filed March 28, 2002, named as Defendants Hamilton County (and thus Hamilton County Commissioners Tom Neyer, Jr., John S. Dowlin, and Todd Portune—actions against the Hamilton County Commissioners in their individual capacities were ultimately dismissed without prejudice (doc. 246)), Chief Deputy Coroner Robert Pfalzgraf (hereinafter "Pfalzgraf"), Staff Pathologist Gary Utz (hereinafter "Utz"), Administrative Aid to the Coroner, Terry Daly (hereinafter "Daly"), Administrator Ronda Gros (hereinafter "Gros"), Parrott, Tobias, and Condon (doc. 31). Plaintiffs bring their Complaint pursuant to 42 U.S.C. § 1983, alleging that Defendants' acts—essentially Condon and Tobias' photography, and the various government officials' alleged policy of deliberate indifference which allowed the photographs to be taken—amount to a violation of their constitutional rights (*Id.*). Plain-

tiffs specifically allege that Defendants violated their substantive due process rights in that Defendants' actions "shock the conscience," deprived them of property rights in the remains of their loved ones, and deprived them of their fundamental right to privacy (*Id.*). Eventually, Plaintiffs moved the Court to dismiss the federal civil rights claims against the individual Defendants and the Court, conditionally, did so with prejudice (doc. 270). Defendants challenged the sufficiency of Plaintiffs' Amended Complaint, and on September 8, 2003, the Court found that Plaintiffs had adequately pleaded their constitutional claims (doc. 111). Plaintiffs had also brought a number of supplemental state law claims, which the Court dismissed without prejudice (*Id.*). Subsequently, the state law claims were reinstated by the Court (doc. 224). The Court conditionally certified a class of Plaintiffs (doc. 96), which included:

> the family members of all the deceased whose remains, for other than a proper government purpose, were accessed, viewed, manipulated, or photographed by Thomas Condon or Jonathan Tobias, M.D., or one of their agents between August 2000 and January 2001 (inclusive) while such bodies were in custody of the Hamilton County Coroner's Office, without permission from the legal representatives of the deceased

(doc. 111).

In early 2004, Parrott, Tobias, and the Hamilton County Defendants filed respective Motions for Summary Judgment on the basis of qualified immunity (docs. 156, 167, 172). On April 30, 2004, Defendant Condon filed his Motion for Summary Judgment, and the Plaintiffs filed a Motion for Partial Summary Judgment on liability (docs. 185, 187). On May 3, 2004, the Hamilton County Defendants filed their Cross–Motion for Summary Judgment on

liability (doc. 188), Parrott did likewise shortly thereafter (doc. 189). The Court denied each of these summary judgment motions (doc. 224). Ultimately, Defendants appealed the Court's ruling as regards Defendants' qualified immunity claims (docs. 227, 228, 236). The Plaintiffs then filed a Motion to Certify these Appeals as Frivolous (doc. 241). Plaintiffs, subsequently, requested that the Court dismiss their federal civil rights claims against the individual Defendants (doc. 270). The Court conditionally did so and instructed the Plaintiffs to seek dismissal of Defendants' pending appeals in the Sixth Circuit (doc. 273). It should be noted that these appeals have been dismissed. However, Plaintiffs Motion to Certify these Appeals as Frivolous (doc. 241) remained on the Court's docket as undecided. This Motion has been rendered moot by the dismissal of the appeals. Ultimately, the Court entered an Order dismissing the federal civil rights claims against the individual defendants (doc. 291)

All Defendants then moved this Court to dismiss, pursuant to Rules 12(b)(6) and 12(c) of the Federal Rules of Civil Procedure, the remaining state law claims pending against both the County and all individually named Defendants (docs. 242, 243). The Court dismissed all intentional tort state law claims made against the County, retained all intentional tort state law claims made against the individually named Defendants, retained the negligent infliction of emotional distress claim made against all Defendants including the County, and dismissed the remaining state tort law claims grounded in negligence against both the County and the individually named Defendants. The Court did not dismiss the Plaintiffs' claim of unjust enrichment or the Plaintiffs' request that a constructive trust be imposed (doc. 283). Defendants then filed Motions for Decertification. The Court did not decertify the

class, but did divide the class into two subclasses (doc. 366).

Sub-class 1 is defined as:

The family members of all the deceased whose remains, for other than a proper government purpose, were photographed by Thomas Condon or Jonathan Tobias, M.D., or one of their agents between August 2000 and January 2001 (inclusive) while such bodies were in custody of the Hamilton County Coroner's Office, without permission from the legal representatives of the deceased;

and Sub-class 2 is defined as:

The family members of all the deceased whose remains, for other than a proper government purpose, were accessed, viewed, or manipulated, by Thomas Condon or one of his agents between August 2000 and January 2001 (inclusive) while such bodies were in custody of the Hamilton County Coroner's Office, without permission from the legal representatives of the deceased.

(*Id.*). The Court also defined "family members" for purposes of the class (*Id.*). "Family members" for purposes of the class encompasses only the surviving spouse of any decedent and, in the event, no surviving spouse exists then the next of kin in order of succession as defined by the Ohio statute of descent and distribution, Ohio Revised Code § 2105.06 (*Id.*). The Plaintiffs have subsequently filed a Motion to Amend/Correct this Order (doc. 368), which the Court will address and grant in a separate Order to follow.

The Court has recounted the facts in this matter with specificity in several of its earlier Orders (*See e.g.,* doc. 283). As such, for a broad understanding of the factual development of this matter, the Court directs the attention of readers and the parties to these earlier Orders. However, the Court finds it important to

recount key facts supported by the developed record and designated by the Plaintiffs in opposition to the various Defendants' Motions for Summary Judgment.

As of today 317 photographs have been recovered taken of persons during autopsy, in the Hamilton County morgue coolers, and at death scenes throughout Hamilton County (doc. 332). The majority of these photographs were taken by Condon although some were taken by Tobias (*Id.*). The photographs at issue have been described as "deplorable" by Parrott as well as "vile" and "sick" by the Hamilton County Prosecutor's office (*Id.*). Parrott admitted that the taking and possession of these photographs served no forensic purpose (*Id.*). Defendants maintain that Condon was in the Hamilton County morgue on no more than five occasions. Yet, Plaintiffs have highlighted instances which reasonably could lead one to find that Condon frequented the morgue at least eleven times (*Id.*). During the time frame in question, August 2000 to January 2001, 532 bodies were in the Hamilton County morgue.

Parrott is the Hamilton County Coroner and he has described his position as the "top policy maker" as it relates to the duties of the morgue and the faithful preservation of the integrity of bodies while in the morgue (*Id.*). Pfalzgraf, referencing Chapter 313 of the Ohio Revised Code, which sets forth the responsibilities of a county coroner, notes that a county coroner has a duty to hold bodies in his custody safely and in a manner respectful of the dignity owed to them (*Id.*). Parrott in his deposition testimony testified that family members are not permitted to view a body of a loved one while it is in the custody of the Hamilton County morgue nor are families allowed to obtain the remains of loved ones until a funeral director has retrieved the body from the morgue (*Id.*).

The Hamilton County morgue is located on the first floor of the Hamilton County Coroner's office (*Id.*). Bodies are housed in one of two coolers (*Id.*). All autopsies are performed in an autopsy suite adjacent to the coolers (*Id.*). In 2000 the autopsy suite was locked and one could not enter without a code (*Id.*). It is undisputed that a "shortcut code of *7" was used by many to access the autopsy suite (*Id.*). According to Tobias' deposition testimony, Condon had this "shortcut code" and used it to access the autopsy suite (*Id.*). The main morgue cooler was generally not locked during the time frame in question (*Id.*). According to Defendant Parrott's deposition testimony, a member of the public could enter the Coroner facility through an unlocked public entrance on the second floor, take an unlocked elevator to the first floor, walk down a hallway, and gain direct access to bodies through the unlocked cooler door (*Id.*). During the time frame in question, no visitor log was maintained at the morgue or Coroner's office (*Id.*). Parrott stated that his security policy was one based "entirely upon trust" and that morgue personnel could provide access to anyone with whom they were familiar (*Id.*).

Parrott acknowledges in deposition testimony that he attended two meetings at which Condon was present (*Id.*). The first, in 1999, was attended by Parrott, Condon, Daly, Gros, and Ernie Waits (hereinafter "Waits") (*Id.*). Daly was employed as an administrative aide for the morgue (*Id.*). Gros was the administrative assistant to Parrott (*Id.*). Her responsibility included custody of records, budget, personnel issues, and general operations (*Id.*). At this first meeting, Parrott described the type of video he desired and that he would be contacting the County Prosecutor for a legal opinion regarding the proposed video project (*Id.*). Parrott admits that the video project was advanced

without competitive bidding or any background investigation into Condon and Waits (the two individuals primarily considered for the video project) (*Id.*).

At the second meeting, held in July 2000, Parrott, Pfalzgraf, Daly, Condon, and Waits were in attendance (*Id.*). Both Daly and Waits, in their deposition testimony, maintain that at either the first or the second meeting, Condon explained his desired photography project and showed those in attendance books by other photographers similar to his desired project (i.e., a book by Germano Celant) (*Id.*). At the second meeting, Parrott assigned to Pfalzgraf and Daly the responsibility of directing efforts to produce the video project (*Id.*). Specifically, Daly was to handle the logistics with Condon and Waits (*Id.*). Pfalzgraf was to supervise the script and perform the autopsy to be videotaped (*Id.*). Parrott informed Pfalzgraf and Daly to allow Condon and Waits "to do whatever they needed to do to determine what resources would be needed to make this film" (*Id.*).

Parrott agreed that Condon should be permitted to take some photographs in an effort to determine the estimated cost of the video project (*Id.*). The access provided to Condon was broader than the access typically provided to lawyers and videographers who seek to review an autopsy, as these individuals are typically required to secure family consent (*Id.*). In a letter from Parrott to the Hamilton County Prosecutor, Parrott commented that he felt seeking consent from family members would only aggravate the situation (*Id.*). The Prosecutor's response stated that consent was not required so long as the video ultimately would be distributed free (in other words so long as no money was to made from the video) (*Id.*). However, the Prosecutor advised Parrott that any distinguishing characteristics of photographed subjects should be obscured (*Id.*). Yet, Parrott admits in his deposition testimony that he permitted Condon to begin taking photographs without disguising identities or unusual physical characteristics (*Id.*). Parrott also testified at deposition that he did not direct Daly or Pfalzgraf to insure identities were masked in any photographs taken by Condon (*Id.*). Although Parrott knew that Condon would be taking photographs and capturing video, at the very least, to make a cost bid for the video project, Parrott did not alert Condon on how to handle the photographs or video made; he did not tell Condon to keep the images produced only in the morgue office; he did not establish a process for retrieving the photographs and video from Condon; he did not require notice or consent from the families; and he did not give any instructions to Condon regarding Condon's art project (*Id.*).

In August 2000, Daly introduced Condon to Pfalzgraf and Tobias (*Id.*). At this time, Daly explained that Condon would be taking photographs for the potential training video (*Id.*). Pfalzgraf was the Chief Deputy Coroner at the time and Tobias a Fellow under the supervision of Pfalzgraf (*Id.*). On August 16, 2000, Pfalzgraf permitted Condon to observe autopsies, yet Pfalzgraf did not require Condon to sign the "view sheet" indicating that Condon was present at the autopsy (*Id.*). Pfalzgraf testified in his deposition that he did not require Tobias to note Condon's presence in the autopsy record that Tobias performed the same day and which Condon observed (*Id.*). In fact, Condon's presence was never recorded on any of the view sheets for autopsies at which he was present and at which he photographed the deceased (*Id.*).

In September 2000, Condon and Waits provided an estimate of $10,000.00 to produce the training video (*Id.*). Parrott ulti-

mately concluded that this price was too high (*Id.*). Parrott maintains that he cancelled the project and terminated any dealings with Condon in September 2000 (*Id.*). However, even after this date in which Parrott maintains he severed all ties with Condon, Utz and Tobias observed Condon taking photographs in the morgue (*Id.*). Pfalzgraf, who was purportedly in charge of the video project along with Daly, was never told by Parrott or anyone else that the video project had been cancelled (*Id.*). Daly was also not aware the project had been cancelled (*Id.*).

Therefore, Plaintiffs claim that Condon remained a welcome figure at the morgue throughout 2000 and through the middle of January 2001 (*Id.*). During this time, Condon received yard signs to distribute for Parrott's election campaign, donated a ham to the Coroner's Office Staff holiday party, and sent Christmas cards to Parrott and other pathologists affiliated with the Coroner's Office (*Id.*). At Condon's criminal sentencing, he informed the judge that he "had permission to pursue my artistic project" (*Id.*). It was during this time, mostly after Parrott allegedly severed all ties with Condon, that Condon took the majority of his photographs of deceased persons in the custody of the Hamilton County morgue, including photographs taken in the autopsy suite and cooler (*Id.*).

These photographs included John Brady on the autopsy table with props (*Id.*). John Brady's autopsy was performed by Pfalzgraf (*Id.*). No record exists of Condon's presence at this autopsy (*Id.*). Another photograph is of Thomas Senteney also on the autopsy table with props (*Id.*). Utz performed Thomas Senteney's autopsy (*Id.*). Again, no record exists that Condon was present at this autopsy (*Id.*). Christina Folchi was photographed in a fashion similar to John Brady and Thomas Senteney (*Id.*). Christina Folchi's autopsy

was performed on January 6, 2001 by Utz (*Id.*). Again, despite his obvious presence, no record exists indicating that Condon was present at this autopsy (*Id.*). The Plaintiffs aver that these facts as well as the visual depiction of morgue doctors in some of Condon's photographs verify that morgue officials had not only knowledge of Condon's art project, but also intentionally approved of said project (*Id.*).

Ultimately Condon was charged criminally and convicted of eight counts of gross abuse of corpse for his activities (*Id.*). Condon claimed the props he used had special meaning (*Id.*). Tobias acknowledges in his deposition testimony that he saw Condon's photographs in January 2001 (*Id.*). Tobias did nothing to stop Condon's activities (*Id.*). In fact, Tobias was using Condon's personal studio to develop his own photographs (*Id.*). Some of the photographs that Tobias left in Condon's studio included death scene photographs of Toby Malakoff (*Id.*). Parrott noted in his deposition testimony that the death scene photographs of Toby Malakoff were sexual in nature, inappropriate, and served no forensic purpose (*Id.*).

Daly testified in deposition that at the first meeting between Condon, Waits, and various Coroner staff, Condon discussed having his own photography project (*Id.*). Condon, at his criminal sentencing, told the sentencing judge that Daly and Utz were shown similar type photographs and were given an explanation of his proposed art project (*Id.*). Utz admitted seeing at least one of Condon's photographs with props (*Id.*). Condon, again at his criminal sentencing, recounted that he had shown Daly and Utz the photographs containing props (i.e., the photograph containing a doll house ladder leaning against an open skull and the photograph with sheet music placed on the body) (*Id.*). Utz did not attempt to stop Condon and, in deposition

testimony, stated that even after seeing the photographs he "still trusted" Condon (*Id.*).

Utz taped a conversation between himself and Daly (*Id.*). During this conversation the two men discussed the photographs (*Id.*). Utz and Daly are heard on the tape laughing about the propped photographs and Utz is recorded saying that the photograph with the ladder leading to the open skull is "kind of cool looking" and "kind of neat" (*Id.*). One other portion of this recorded conversation is worth noting. At one point Utz stated, "Didn't he [Parrott] know that Thomas [Condon] had an interest in doing this stuff?" (*Id.*). Daly responded, "We all did ... verified that goddamn book was in that first fucking meeting and everybody in that goddamn room looked at it" (*Id.*).

Plaintiffs maintain that despite evidence of misconduct on the part of Utz and others, the County never performed an independent investigation to determine if any of its employees should be administratively disciplined (*Id.*). The only Coroner employee who was disciplined was Tobias (*Id.*). The Plaintiffs aver that the County and Parrott immediately tried to limit the investigation to Condon and Tobias (*Id.*). Condon and Tobias were the only individuals indicted, tried, and convicted for their actions (Tobias' conviction was overturned on appeal) (*Id.*). The Plaintiffs argue that the County, in order to cast all guilt onto only Condon and Tobias and not onto itself, had to cover-up facts that showed the knowledge, acquiescence, and involvement of Parrott and other members of his staff (*Id.*).

The first step, asserts the Plaintiff, in perpetuating this cover-up was to isolate Tobias by suspending him (*Id.*). Tobias, in deposition testimony, stated that Parrott and Gros, in response to his questioning why he was suspended, said he was sus-pended because they needed "to protect the county" (*Id.*). Tobias viewed this statement as the County's attempt to label him as a scapegoat especially since the County was aware that civil litigation was imminent (*Id.*). Several Coroner employees, including Pfalzgraf and Utz, protested Tobias' suspension (*Id.*). Utz noted that Tobias had done nothing worse than anyone else in the Coroner's office (*Id.*). According to deposition testimony of Pfalzgraf and Utz, Parrott stated he was only doing what County prosecutors had told him to do (*Id.*). Tobias maintained in his deposition testimony that Parrott stated he could not talk to Tobias because he [Tobias] knew that Parrott knew about the art books (*Id.*). This, Plaintiffs conclude, demonstrates that Parrott felt it necessary to isolate Tobias because he possessed damaging information about him, a County policymaker whose knowledge of Condon's activities would expose the County to liability (*Id.*).

The Plaintiffs highlight other instances supporting their allegation of a cover-up (*Id.*). For example, the taped conversation between Daly and Utz was not released during the criminal trial of Condon and Tobias (*Id.*). Additionally, the opinion letter from the County prosecutor authorizing the video project without obtaining consent from family members was not released during the criminal trials (*Id.*). Hamilton County Commissioner Todd Portune, during the sentencing phase of Condon's criminal trial, in a letter to the sentencing judge, commented he felt there was a cover-up (*Id.*). Commissioner Portune, in his letter, indicated he felt the blame for the morgue photographs scandal properly belonged to the Coroner's office administrators (*Id.*). Additionally, Commissioner Portune revealed allegations that County prosecutors visited the mor-

gue and "openly threatened" individuals on what to say and how to testify (*Id.*).

Plaintiffs maintain that Condon conceived and planned a "cycle of life" photography project (i.e., the "art project"), which entailed taking propped photographs of dead bodies inside the Hamilton County Coroner's office (*Id.*). According to Plaintiffs, three key questions surround this project. (*Id.*). First, what did Parrott know about the art project? (*Id.*). Second, when did Parrott first learn about the art project? (*Id.*). And, third, how did Parrott and his staff respond to Condon's proposed art project? (*Id.*). Answering these questions, aver Plaintiffs, necessarily requires a more detailed examination of the two meetings held between Condon, Waits and Coroner office personnel (*Id.*).

Parrott admits in his deposition that he was present at these two meetings (*Id.*). However, he claims to have no recollection of any discussion concerning Condon's art project or of seeing sample art books containing photographs similar to the ones subsequently taken by Condon (*Id.*). Yet, in deposition testimony, Daly and Gros described Parrott as having learned about and discussed Condon's art project at these meetings (*Id.*). Additionally, Waits testified in deposition that Daly had seen the books with examples of Condon's proposed art project (*Id.*). Waits also testified that Parrott, at the second meeting, looked through the sample books brought by Condon to the meeting (*Id.*). Waits asserts that Parrott leafed through the books and commented that he had seen similar material before (*Id.*). Waits testified as well that he was under the impression that he could have, had he desired to do so, proceeded with his own personal project involving photography or videography at the morgue (*Id.*). Waits notes that he was never told he couldn't proceed with

his own personal project and was never told by anyone that Condon could not proceed with his art project (*Id.*). At Condon's criminal trial, Parrott testified that he could not recall whether he saw these sample art books (*Id.*). However, at the time of his final deposition, Parrott still testified that could not recall, but added that he "c[ouldn't] say that it was [discussed]" (*Id.*).

## APPLICABLE LEGAL STANDARD

The narrow question that this Court must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Id.* at 321, 106 S.Ct. 2548; *Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 405 (6th Cir.1992); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see *Guarino,* 980 F.2d at 405.

As the Supreme Court stated in *Celotex*, the non-moving party must "designate" specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Guarino*, 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, " 'the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.' " *Guarino*, 980 F.2d at 405 (quoting *Inter–Royal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir.1990). Furthermore, the fact that the non-moving party fails to respond does not lessen the burden on the moving party or the court to demonstrate that summary judgment is appropriate. *Guarino*, 980 F.2d at 410; *Carver v. Bunch*, 946 F.2d 451, 454–55 (6th Cir. 1991).

## DEFENDANTS' VARIOUS MOTIONS FOR SUMMARY JUDGMENT (docs.315, 321, 325, 327)

The arguments contained in the Defendants' various Motions for Summary Judgment are outlined below.

1. *Parrott's Motion for Summary Judgment (doc. 315)*

 a. Parrott argues he is entitled to summary judgment based upon statutory immunity as granted under Chapter 2744 of the Ohio Revised Code with respect to Plaintiffs' claims for intentional infliction of emotional distress (hereinafter "IIED") and Civil Conspiracy (*Id.*).

 b. The law of Ohio does not support this Court's conclusion that Chapter 2744 of the Ohio Revised Code is unconstitutional (*Id.*).

 c. Plaintiffs have failed to present evidence sufficient to establish that a genuine issue of material fact exists with respect to their claim for IIED (*Id.*). Specifically, he argues:

 i. The Plaintiffs have not proven that he intentionally or recklessly acted in an extreme and outrageous manner. He defines reckless as a person who acts with heedless indifference and perversely disregards a known risk that his conduct is likely to cause serious emotional distress (*Id.*).

 d. Plaintiffs have failed to present sufficient evidence to establish a genuine issue of material fact with respect to their claim for Civil Conspiracy (*Id.*). Specifically, Parrott argues:

 i. That a claim for Civil Conspiracy requires a showing of malice, which he defines as a state of mind under which one does a wrongful act purposely, without reasonable or lawful excuse, to the injury of another (*Id.*).

 ii. No evidence of a malicious combination between Parrott and one other Defendant has been established (*Id.*).

 e. Plaintiffs have failed to present evidence sufficient to establish a genuine issue of material fact with respect to their claim of Negligent Infliction of Emotional Distress (hereinafter "NIED") (*Id.*). Specifically, he argues:

i. This Court's "dead body" exception is contrary to Ohio Law.

2. *The County Defendants' Motion for Summary Judgment (doc. 321)*

 a. All individual County Defendants are entitled to immunity pursuant to Chapter 2744 of the Ohio Revised Code as pertain to Plaintiffs' IIED and Civil Conspiracy claims (*Id.*). Specifically,

 i. The individual County Defendants are protected by political subdivision immunity as set forth in Section 2744.02(A)(1) of the Ohio Revised Code (*Id.*).

 b. The law of Ohio does not support this Court's conclusion that Chapter 2744 of the Ohio Revised Code is unconstitutional (*Id.*).

 c. The County Defendants are entitled to summary judgment on Plaintiffs' claims of IIED and NIED for the following reasons:

 i. Plaintiffs have failed to establish that the emotional distress purportedly suffered is "serious" (*Id.*). The Court may, notes the County Defendants, rule as a matter of law whether the alleged injuries are serious (*Id.*). The seriousness of distress, asserts the County Defendants, must be determined on a case-by-case basis.

 ii. Plaintiffs cannot establish that their alleged injuries were proximately caused by the County Defendants' purported misconduct (*Id.*).

 iii. Plaintiffs cannot establish that any of the individual County Defendants intentionally or recklessly engaged in extreme and outrageous conduct for purposes of Plaintiffs' IIED claim (*Id.*).

 d. The County Defendants are entitled to summary judgment as to Plaintiffs' Civil Conspiracy claim for the exact reasons as articulated by Parrott (*Id.*).

 e. The Plaintiffs have failed to provide sufficient evidence to thwart a summary judgment motion as relates to their NIED claim (*Id.*). Specifically, the County Defendants do not find, as this Court has already held, a "dead body" exception to the general requirements of an NIED claim under Ohio law (*Id.*).

 f. The County Defendants are entitled to summary judgment on the Plaintiffs' Section 1983 federal civil rights claim, despite this Court already ruling to the contrary (*Id.*). Specifically, the County Defendants assert that the issues of seriousness and proximate cause support granting summary judgment (*Id.*).

3. *Condon's Motion for Summary Judgment (doc. 325)*

 a. Plaintiffs' Section 1983 should be dismissed as Plaintiffs have failed to establish that they suffered serious emotional distress and they have failed to present sufficient evidence to establish that Condon's conduct was the proximate cause of the Plaintiffs' alleged injuries (*Id.*).

 b. No evidence has been proffered by the Plaintiffs establishing that a conspiracy existed involving Condon and others and, even if such evidence had been presented, the claim must be dismissed for a lack of showing as it relates to the seriousness of Plaintiffs' injuries and proximate cause (*Id.*).

 c. As to Plaintiffs' IIED claim, Condon argues that sufficient evidence has not been presented by Plaintiffs to establish that they sustained serious emotional distress nor any evidence that it

was Condon's conduct that proximately caused the alleged injuries (*Id.*).

d. Condon posits the same arguments as directly above in 3(c) for Plaintiffs' NIED claim (*Id.*). He also argues that the "dead body" exception to NIED does not exist under Ohio law (*Id.*).

e. As to Plaintiffs' Unjust Enrichment and Constructive Trust claims, Condon maintains that Plaintiffs have presented no evidence that he has been unjustly enriched nor any evidence that any other photographs exist on which to place a constructive trust (*Id.*).

4. *Tobias' Motion for Summary Judgment (doc. 327)*

a. Tobias incorporates in relevant part those arguments contained in the County Defendants' Motion for Summary Judgment (*Id.*).

b. In addition to the arguments put forth by the County Defendants concerning immunity pursuant to Chapter 2744 of the Ohio Revised Code, Tobias argues that he was acting only within the scope of his employment and permitting Condon access to the morgue only because his supervisors authorized such access (*Id.*).

c. As to the IIED claim, Tobias argues he did not engage in extreme and outrageous conduct by acting intentional or recklessly (*Id.*). Tobias defines recklessly as acting with perverse disregard to a known risk that one's conduct is likely to cause serious emotional distress (*Id.*).

Evident from the Defendants' various Motions to Dismiss, is the fact that many of the arguments asserted by one Defendant are echoed by the others. As such, the Court combines and summarizes the various arguments into the following:

1. A "dead body" exception does not exist in Ohio as it pertains to NIED. As such, Plaintiffs' claim for NIED should be dismissed as a matter of law.

2. Defendants argue they are entitled to summary judgment on a number of Plaintiffs' claims because Plaintiffs have failed to demonstrate that their emotional distress was serious and that Defendants' actions were the proximate cause of this alleged, serious emotional distress. Those claims are: IIED, NIED, Civil Conspiracy, and Section 1983 civil rights claim.

3. Defendants argue they are entitled to summary judgment as to Plaintiffs' IIED claim because Plaintiffs have failed to demonstrate that any of the individual Defendants acted intentional or recklessly.

4. As to the Plaintiffs' claims for IIED and Civil Conspiracy, the County Defendants, Parrott, and Tobias argue they are entitled to summary judgment as they are immune from liability pursuant to Chapter 2744 of the Ohio Revised Code. As part of this assertion, it is alleged that this Court's previous ruling finding Chapter 2744 unconstitutional is erroneous.

5. Summary judgment is appropriate on Plaintiffs' claim of Civil Conspiracy because no evidence has been produced showing that any Defendants conspired in a malicious manner.

 The Court will address these various arguments in turn. First, the Court reaffirms its analysis found in its earlier Order denying the various Defendants' Motions to Dismiss State Law Claims as it relates to the *"Carney"* exception to NIED under Ohio law (*See* doc. 283). The following is an extensive quote from this Court's

previous Order (doc. 283), analyzing this issue:

"... Plaintiffs note that the Ohio Supreme Court in *Heiner* stated:

We note, in passing, that there does exist some case law in this state recognizing certain exceptions to the actual-peril requirement. *See e.g., Carney v. Knollwood Cemetery Assn.*, 33 Ohio App.3d 31, 33–34, 514 N.E.2d 430, 432–33 (permitting recovery for negligent infliction of emotional distress where defendants were responsible for desecration of a grave.)"

*Heiner* at 670 n. 3. The court in *Carney* held that a claim for "abuse of a dead body has long been recognized in this country." *Carney* at 432 *citing Brownlee v. Pratt*, 77 Ohio App. 533, 68 N.E.2d 798, 800–01 (1946). *Carney* notes that recognition of this claim has existed since "ancient times" and that the existence of "infliction of serious emotional distress" is a relatively new phenomenon *Id.* Mental anguish will undoubtedly result from the mishandling of a corpse, notes *Carney.* *Id.* at 433. *Carney* also states that:

[T]he caveat of the [Ohio] Supreme Court in *Paugh* that 'the determination in both seriousness and reasonable foreseeability must be accomplished on a case-by-case basis ... [N]o fixed or immutable rule is capable of resolving all of the cases brought under an action for negligent infliction of serious emotional distress.'

*Id.*

The *Carney* court contains a detailed analysis of the possibility that a plaintiff may recover for negligent infliction of emotional distress absent the requirements enumerated in *Schultz* and *Heiner*. *Id.* at 433–35. *Carney* cites William L. Prosser, *Law of Torts* (4th ed.1971) at 328–330 and the Restatement (Second) Torts § 868 (1979) in its analysis. *The Law of Torts* states that "[i]n only two groups of special cases has there been any tendency to break away from the settled rule, and to allow recovery for mental disturbance alone ... [t]he other group of cases has involved the negligent mishandling of corpses". William L. Prosser, *Law of Torts*, 329 (4th ed.1971). Additionally, "what all of these cases appear to have in common is an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious". *Id.*

Section 868 of the Restatement (Second) Torts, cited by *Carney*, states the following: "One who intentionally, recklessly or *negligently* removes, withholds, mutilates, or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body". *Id.* (emphasis added). Comment A of this section of the Restatement provides that a cause of action in tort exists "against one who intentionally, recklessly, or *negligently* mistreats or improperly deals with the body ... and in reality the cause of action has been exclusively one for mental distress ..." *Id.* (emphasis added). Additionally, Comment D states, "[t]he rule stated in this Section applies not only to an intentional interference with the body itself or with its proper burial or cremation, but also to an interference that is reckless or *merely negligent."* *Id.* (emphasis added). The Restatement also states that a majority of the more recent cases have allowed recovery for negligence in the "abuse of a corpse" arena. *Id.*

*Carney* continues its analysis, holding that " '[t]he law is not primarily concerned with the extent of physical injury to the bodily remains but with whether there were any improper actions and whether

such actions caused emotional or physical suffering to the living kin ... the generally recognized basis of damages is mental suffering.'" *Carney* at 435 *citing Scarpaci v. Milwaukee County,* 96 Wis.2d 663, 292 N.W.2d 816, 821–21 (1980). Thus, despite the requirements of *Schultz* and *Heiner,* an exception has been carved out by the court in *Carney* allowing a claim for negligent and intentional infliction of emotional distress in instances where a dead body is involved.

The Court is confronted with conflicting Ohio authority regarding whether negligent infliction of emotional distress is a valid claim, absent the requirements enunciated in *Schultz* and *Heiner,* where dead bodies are involved. The only Ohio Supreme Court case that has mentioned *Carney* is *Heiner.* Although Defendants maintain *Heiner's* comment acknowledging *Carney* lends no credence to the decision in *Carney,* the Court is not so easily persuaded.

When faced with the need to resolve an undecided question of state law, a federal court must make the "best prediction, even in the absence of direct state precedent, of what the [state] Supreme Court would do if confronted with [the] question." *Combs v. International Ins. Co.,* 354 F.3d 568, 577 (6th Cir.2004) (addressing issue in diversity action); *see also Welsh v. U.S.,* 844 F.2d 1239, 1245 (6th Cir.1988) (addressing issue in Federal Tort Claims Act case). In performing this inquiry, the Court "may rely upon analogous cases and *relevant dicta* in the decisional law of the State's highest court, opinions of the State's intermediate appellate courts to the extent that they are persuasive indicia of State Supreme Court direction, and persuasive opinions from other jurisdictions, including the 'majority rule.'" *Welsh,* 844 F.2d at 1245 (emphasis added); *see also generally Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82

L.Ed. 1188 (1938). Whether this Court would find this rule advisable or fair is immaterial and is of no weight in the analysis. *See Combs,* 354 F.3d at 577; *Kurczi v. Eli Lilly & Co.,* 113 F.3d 1426, 1429 (6th Cir.1997).

The Court is faced with conflicting Ohio Appellate level cases on this issue. *Audia,* a decision from Seventh Appellate District in Ohio, declines to except the Restatement's position. *Carney,* an Eighth Appellate District Ohio case, and *Lyle v. Aron,* 1997 WL 679528 (Ohio App. 6th Dist. Oct. 31, 1997) (noting that although the parameters of negligent infliction of emotional distress should be confined an exception exists in the "abuse of corpse" arena), do follow the Restatement. The Supreme Court of Ohio has mentioned the decision in *Carney,* albeit in a footnote *Heiner* at 670 n.3. The comment in *Heiner* signifies the Ohio Supreme Court's recognition of the *Carney* exception, without adopting or rejecting said exception. *Id.*

The Restatement (Second) of Torts parallels the *Carney* exception and, likewise, abrogates the requirements of *Schultz* and *Heiner.* Restatement (Second) of Torts § 868 (1979). Additionally, the Restatement indicates that this is the majority view in more recent cases across various jurisdictions. *Id.* It is important to note the Ohio Supreme Court has often turned to the Restatement (Second) of Torts in determining an issue. *See e.g., Kenty* at 866 (looking to the Restatement (Second) of Torts in determining the elements of tortious interference with a contract); *McGlashan v. Spade Rockledge Terrace Condo Development Corp.,* 62 Ohio St.2d 55, 402 N.E.2d 1196 (1980) (using the Restatement (Second) of Torts to resolve surface water controversies); *Bennett v. Stanley,* 92 Ohio St.3d 35, 748 N.E.2d 41 (2001) (adopting the "attractive nuisance" doctrine as contained in the Restatement

(Second) of Torts); and *McAuliffe v. W. States Import Co.*, 72 Ohio St.3d 534, 651 N.E.2d 957 (1995) (adopting Section 402A of the Restatement (Second) of Torts regarding strict liability of manufacturers, retailers, and distributors of products).

Thus, the Court predicts that given the opportunity the Ohio Supreme Court would recognize the exception provided in *Carney* and the Restatement (Second) of Torts § 868. Of the Ohio Appellate courts that have discussed the issue, two recognize the exception, one does not. The Ohio Supreme Court has, at the very least, acknowledged the exception and the Restatement (Second) of Torts has often been a guiding force in Ohio Supreme Court jurisprudence. In so predicting, the Court finds that Plaintiffs have "pleaded facts sufficient to abate all Defendants' Motions to Dismiss as relates to the claim of negligent infliction of emotional distress ..." (doc. 283). Accordingly, arguments contained in the Defendants' various Motions for Summary Judgment asserting that the *"Carney"* exception to NIED does not exist under Ohio law are not well-taken.

The Court now turns to Defendants' arguments that Plaintiffs' have not presented evidence sufficient to establish they suffered serious emotional distress (docs. 315, 321, 325, 327). Plaintiffs argue that the level of "seriousness" required for the *Carney* exception to NIED need not be the level required in typical NIED cases under Ohio law (doc. 332). As noted above, "what all of these cases appear to have in common is an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." William L. Prosser, *Law of Torts*, 329 (4th ed.1971). "Serious mental distress" is typically the outcome when a corpse is mishandled. *See e.g.*, Prosser, *Law of Torts; Lacy v. Cooper Hosp./Univ.*

*Med. Cen.*, 745 F.Supp. 1029, 1035 (D.N.J. 1990) *(internal citations omitted)*; *Perry v. St. Francis Hosp. & Med. Cen.*, 886 F.Supp. 1551, 1561 (D.Kan.1995).

The court in *Carney*, as discussed above, noted that "seriousness" should be determined on a case-by-case basis and that "no fixed or immutable rule is capable of resolving all of the cases brought under an action for negligent infliction of serious emotional distress." *Carney* at 433. It would stand to reason since "serious emotional distress" is the resultant where a mishandled corpse is involved and, further, that seriousness is determined on a case-by-case basis that "serious emotional distress" in the *Carney* arena can be something different than that required in typical NIED cases. Clearly the level of seriousness discussed in *Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 759, 761 (1983) would suffice ("serious emotional distress" occurs where the distress is both severe and debilitating and renders "a reasonable person, normally constituted, ... unable to cope adequately with mental distress."). Yet, "seriousness" might also suffice, in the mishandling of a corpse arena, where, as in *Carney*, the plaintiffs were "horrified," "angry," "saddened," "wept," and "were unable to sleep." *Carney* at 432.

▮ Ultimately, the Court concludes that determining whether Plaintiffs' injuries were "serious" is a question best determined on a case-by-case basis. Furthermore, it concludes that although the Plaintiffs' level of emotional distress must be "serious," "seriousness" in the context of a mishandled corpse is something unique. It is something that renders a reasonably constituted person "unable to cope adequately" given the distress, but it need not be "severe and debilitating" in the traditional sense.

■ This is a question for the jury. Plaintiffs have provided ample evidence that they suffer from serious emotional distress in light of the unique circumstances of this case (i.e., the presence of a dead body and its subsequent mishandling). Plaintiffs' expert Dr. Paul Deardorff has thoroughly documented said emotional distress in his reports. These reports contain account after account of extreme anger, extraordinary grief, and persistent depression (doc. 332). The Court will leave it to the jury to determine whether it is "serious" enough. Therefore, arguments that summary judgment should be granted as a result of Plaintiffs' deficiency in establishing severe emotion distress are not well-taken.

■ The Court turns next to Defendants' assertion that Plaintiffs have failed to establish that their (Defendants') actions proximately caused the Plaintiffs' alleged severe emotional distress and that the individual Defendants did not act in at least a reckless manner (docs. 315, 321, 325, 327). First, Dr. Deardorff reports that although each Plaintiff was already suffering from grief over the lost of a loved one, the Defendants' actions prolonged the grief, causing their severe emotional distress (doc. 332). As such, the Court finds that this is a matter of which a genuine issue of material fact exists and, accordingly, should be decided by a jury. Thus, arguments based on this theory, posited by Defendants in their Motions for Summary Judgment are, likewise, not well-taken.

■ The Court also finds that genuine issues of material fact exist as to whether the individual Defendants acted in an extreme and outrageous manner, thus recklessly causing Plaintiffs' emotional distress. The fact section of this Order, based upon evidence put forth by the Plaintiffs and supported by the record, could lead a reasonable jury to conclude that the County and the individual Defendants acted recklessly in an extreme and outrageous manner. Some of these facts are recounted below. It is interesting to note that the Plaintiffs address this issue as it relates to each individual Defendant except one, that being Gros (doc. 332). As such the Plaintiffs have not provided sufficient evidence to withstand summary judgment as it relates to Gros. Accordingly, Ronda Gros is dismissed as Defendant in this matter.

■ Parrott testified in deposition that the photographs taken by Tobias of Toby Malakoff at her death scene were "souvenirs" or "art," served no forensic purpose and should not have been present in Condon's personal studio (*Id.*). Tobias conceded in deposition that he saw propped photographs of John Brady in September 2000 (*Id.*). He maintains he brought to his supervisors' attention the photographs, however Plaintiffs dispute this (*Id.*). Allegedly doing nothing to stop Condon's conduct, Tobias acquiesced in Condon's art project, permitting Condon to continue taking photographs of dead bodies in the morgue for another four months (*Id.*). Pfalzgraf stated that had he known of the project he would have reported it to Parrott immediately (*Id.*). The question presents itself: did Tobias inform his supervisor as he claims? Tobias' own conduct— i.e., the pictures taken of Toby Malokoff— and his failure to stop or notify others of Condon's conduct is sufficient evidence for a jury to find that Tobias acted recklessly in an extreme and outrageous manner.

■ Utz made an audiotape in which he described Condon's propped photographs as "neat" and "cool" (*Id.*). Utz performed the autopsy of Thomas Senteney at which Condon was present and at which he photographed the autopsy (*Id.*). Utz also performed the autopsy of Christina Folchi

(*Id.*). Again, an autopsy for which no record exists that Condon was present (*Id.*). However, Condon took propped photographs of Ms. Folchi using sheet music, a snail placed near her groin, and other items pressed into her hands and mouth (*Id.*). Utz admits to seeing these propped photographs (*Id.*). Utz concedes he did nothing after seeing these photographs, offering an excuse of being too busy (*Id.*). When Condon asked Tobias in December 2000 if he could come to the morgue and take more photographs, Tobias reportedly passed this request on to Utz (*Id.*). Utz allegedly gave blanket permission to Condon to take more photographs (*Id.*). Tobias testified in deposition that Utz permitted Condon to be present at the autopsy of Jonathan Frith and to take photographs of a child (*Id.*). This evidence could lead a reasonable jury to find Utz's behavior reckless, extreme, and outrageous in that he acquiesced in Condon's behavior.

■ Pfalzgraf was the Chief Deputy Coroner and a supervisor of Tobias (*Id.*). Pfalzgraf permitted Condon to observe autopsies on August 16, 2000 but did not require Condon to sign the "view sheet" (*Id.*). He also did not require Tobias to note Condon's presence in the record of the autopsy that Tobias performed that day (*Id.*). In fact, there is no record of Condon's presence at any autopsy in which he took photographs (*Id.*). Pfalzgraf performed the autopsy on John Brady (*Id.*). Condon took photographs of John Brady on the autopsy table with a doll furniture ladder leading up to his opened skull (*Id.*). Pfalzgraf concedes that Condon was present at this autopsy (*Id.*). The Plaintiffs state that Pfalzgraf "recklessly turned the morgue into a photographer's playhouse" by letting Condon roam freely through the morgue and attend autopsies (*Id.*). Again, a jury could find Pfalzgraf's acted reck-

lessly in an extreme and outrageous manner by acquiescing in Condon's behavior.

■ Evidence has been proffered that Parrott knew of Condon's art project plans (*Id.*). Parrott, despite the recommendation from the County Prosecutor, allowed Condon to take initial photographs without obscuring distinguishing characteristics, he established no procedure as to what Condon was to do with the photographs when finished, and established no procedure on how we would retrieve the photographs from Condon (*Id.*). Although Parrott claims to have cancelled the video project, Pfalzgraf states he was never told the project was cancelled and Parrott does not recall telling Daly about the cancellation (*Id.*). Parrott put Pfalzgraf and Daly in charge of the video project but neglected to tell them the project was cancelled (*Id.*). Condon's continued presence at the morgue, in ways not connected to his art project (e.g., receiving and distributing signs for Parrott's election campaign, donating a ham to the Coroner staff holiday party, and sending Parrott a Christmas card) could be viewed as telling evidence that Parrott indeed did not cancel the video project and was aware of Condon's presence after Parrott's purported termination of any connection with Condon (*Id.*). Tobias specifically told Parrott that the donated ham was from "Thomas, the photographer" involved in the video project (*Id.*). Parrott responded "fine" (*Id.*). This could have been Parrott's chance to make sure Tobias knew the project was cancelled. Moreover this could have put Parrott on notice that Condon was still visiting the morgue. Again, these facts could lead a jury to find Parrott acted recklessly in an extreme and outrageous manner.

■ A jury could find that, based on the evidence contained in the record, that the County failed to properly train Coroner staff regarding when access should be

granted or denied to persons seeking to enter the autopsy suite and/or coolers. Parrott testified that the security system at the Coroner's office and morgue was one based simply on "trust" (*Id.*). Several morgue employees aver that they received no training on who was to be permitted entry to the morgue (*Id.*). Additionally, evidence of the individual Defendants and the County's cover-up is sufficient to support a finding of reckless conduct. This behavior could be viewed as outrageous and extreme by a reasonable jury.

The Court now turns to the Defendants' arguments relating to immunity pursuant to Chapter 2744 of the Ohio Revised Code. The County Defendants spend considerable time in their Motion for Summary Judgment (doc. 321) and Reply Memorandum in Support of their Motion for Summary Judgment (doc. 338) arguing that the Court's earlier distinction between "governmental" and "proprietary" functions is erroneous. Although the Court did discuss this distinction, it did not rest its opinion on that distinction (doc. 283). The Court, for purposes of addressing the current Motions for Summary Judgment as it pertains to the Defendants' arguments centering around Chapter 2744, finds it helpful to again quote extensively from its previous Order. In its previous Order, the Court stated:

... Chapter 2744 of the Ohio Revised Code plays an integral part in Defendants' Motions. Chapter 2744 purports to grant to political subdivisions (including counties) immunity from tort liability, limited only by the exceptions found within the Chapter. *See* Ohio Rev.Code Ann. §§ 2744.01 *et seq.* (West 2004). The Court does not dispute that Chapter 2744 would apply to counties. *See e.g., Cater v. City of Cleveland,* 83 Ohio St.3d 24, 697 N.E.2d 610 (1998). This Court, in several earlier opinions, has found Chapter 2744 to be unconstitutional. *See e.g., Kammeyer v. City of Sharonville,* 311 F.Supp.2d 653 (S.D.Ohio 2003); *Owensby v. City of Cincinnati,* 385 F.Supp.2d 626 (S.D.Ohio May 19, 2004), 2004 U.S. Dist. Lexis 9444. Although the Court stands behind its earlier determination that Chapter 2744 is unconstitutional, it need not rely upon this finding of unconstitutionality in reaching the conclusions contained herein.

Defendant, Hamilton County, in its Motion to Dismiss, maintains that it can not be held liable for the intentional torts of its employees (doc. 242). Plaintiffs, in their Amended Complaint (doc. 31) assert a claim against the County for intentional infliction of emotional distress. The County cites *Wilson v. Stark County Dep't of Human Serv.,* 70 Ohio St.3d 450, 639 N.E.2d 105, 107 (1994). *Wilson* stated, "[t]here are no exceptions to immunity from the intentional torts of fraud and intentional infliction of emotional distress" caused by a political subdivision's employees (*Id.*). The County asserts that *Wilson* clearly establishes that counties have immunity for the intentional torts committed by their employees (doc. 242). The Court can find no Ohio case stating *Wilson* is incorrect in its determination. Plaintiffs did not, in their Memorandum in Opposition or at the hearing, cite to any contrary Ohio authority. As such, the Court finds that Plaintiffs' state law claim for intentional infliction of emotional distress can not stand against the County.

Plaintiffs also make a claim against the County for civil conspiracy (doc. 31). Defendants counter this claim with the same argument used against Plaintiffs' intentional infliction of emotional distress claim (doc. 242). In other words, Defendants maintain that civil conspiracy in Ohio is an intentional tort and, thus, the County is immune from liability (*Id. citing Kenty v. Transamerica Premium Ins.,* 72 Ohio

St.3d 415, 650 N.E.2d 863, 866 (1995)). The *Kenty* court defines civil conspiracy as, "a malicious combination of two or more persons to injure another person or property, in a way not competent for one alone, resulting in actual damages" (*Kenty* at 866).

A civil conspiracy by its very nature requires an agreement. Black's Law Dictionary (8th ed. 2004 Westlaw). An agreement to commit negligence is not possible and, as such, a civil conspiracy must be a conspiracy to commit some type of underlying intentional tort. *See Bevan Group 9 v. A–Best Products Co.*, 2004 WL 1191713 (Ohio Common Pl., Cuyahoga County, May 17, 2004) ("... Ohio law deems civil conspiracy an intentional tort"); *Gosden v. Louis,* 116 Ohio App.3d 195, 687 N.E.2d 481, 496–97 (1996). Given the Court's analysis above concerning the liability of the County for the intentional torts of its employees (i.e., the holding in *Wilson* ), Plaintiffs' claim for civil conspiracy against the County is dismissed.

The holding in *Wilson* provides immunity to the County for the intentional torts of its employees. Yet, it does not provide immunity to the individuals themselves for their alleged intentional torts. Thus, a further understanding of Chapter 2744 and its exceptions is necessary to address Plaintiffs' intentional tort claims against the individual Defendants as well as the various claims based in negligence made against both the County and the individuals. This further analysis follows.

The Court concludes that sufficient facts have been pleaded to sustain the Plaintiffs' claim against the individual Defendants for civil conspiracy. As detailed fully below, the Court finds that a unique claim for both intentional and/or negligent infliction of emotional distress is available in Ohio where a dead body is involved. Therefore, Plaintiffs may prove the individual Defen-

dants acted in "malicious combination ... to injure [Plaintiffs] ..., in a way not competent for one alone, resulting in [severe emotional distress]."

Chapter 2744 requires a three-tiered analysis for determining whether a political subdivision is immune from liability. *See e.g., Cater v. City of Cleveland,* 83 Ohio St.3d 24, 697 N.E.2d 610, 614 (1998); Ohio Rev.Code § 2744.01 *et seq.* (West 2004). First, section 2744.02(A)(1) provides the general rule of immunity. The section provides in pertinent part:

> [A] political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

Ohio Rev.Code § 2744.02(A)(1) (West 2004). Second, a series of exceptions to this general grant of immunity is available. *See* Ohio Rev.Code § 2744.02(B)(1—5) (West 2004). A plaintiff, when seeking to attach liability to a political subdivision, must find that the alleged action(s) purported to have been committed by the political subdivision and/or its employees fall within one of the exceptions (*Id.*). Lastly, even if an exception is found to exist under section 2744(B)(1–5), immunity can be restored provided a statutory defense is available under section 2744.03. *Cater* at 615.

Having established that the County is not liable for the intentional tort claims made by Plaintiffs, the Court must consider the exceptions available in section 2744.02(B)(1–5) to determine if Plaintiffs' claims based in negligence can survive the general grant of immunity provided by Chapter 2744. The Plaintiffs make an interesting argument that the immunity for negligent actions granted by Chapter 2744

is inapplicable in the current matter (doc. 256). Plaintiffs maintain that as provided by section 2744(A)(1) (the section of Chapter 2744 providing the general rule of immunity) immunity only attaches if the actions complained of are "governmental" or "proprietary" in nature. Ohio Rev.Code § 2744(A)(1) (West 2004).

Plaintiffs argue that the actions of the Coroner's office in this matter are neither "governmental" or "proprietary" (doc. 256). Plaintiffs aver actions which are not "governmental" do not automatically become "proprietary" and vice versa (*Id.*). In other words, assert Plaintiffs, these two types of actions (governmental and proprietary) are not "defined as the obverse of one another ..." (*Id.*). The Defendants, of course, argue that no other type of action exists (doc. 259). In other words the only type of action that a political subdivision can engage in is either "governmental" or "proprietary" (*Id.*). Defendants state, "contrary to Plaintiffs' assertion, governmental functions and proprietary functions *are* defined as the obverse of one another" (*Id.*).

Defendants cite a law review article for the proposition that "governmental" and "proprietary" are defined as the obverse of one another (*Id. citing* John A Gleason & Kenneth Van Winkle, Jr., Comment, *The Ohio Political Subdivision Tort Liability: A Legislative Response to the Judicial Abolishment of Sovereign Immunity*, 55 U. Cin. L.Rev. 501, 511 (1986)). A clear reading of this particular law review comment provides the following. First, the authors note that a "governmental function" is one that the political subdivision is obligated to perform. *Id.* at 510. Furthermore, the authors define a "governmental action" as one that "benefits all people of the state" and is an act not engaged in by "non-governmental entities." *Id.* at 511. The authors define a

"proprietary" function as "any non-governmental function", provided it is a function that "is customarily engaged in by non-governmental entities." *Id.* The authors also acknowledge that determining what is and is not a "governmental function" will necessarily involve judicial interpretation. *Id.*

Additionally, a detailed reading of the statutory language in Chapter 2744 reveals the same and some additional limitations in defining a "governmental" and "proprietary" function. *See* Ohio Rev.Code § 2744.01 *et seq.* (West 2004). Section 2744.01 states:

(C)(1) 'Governmental function' means a function of a political subdivision that is specified in division (C)(2) of this section or satisfies any of the following

(a) A function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;

(b) A function that is for the common good of all citizens of the state;

(c) A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons; and that is not specified in (G)(2) of this section as a proprietary function

Ohio Rev.Code § 2744.01(C)(1) (West 2004). Sub-section (C)(2)(a-x) of section 2744.01 lists a number of specific "governmental" functions that are not applicable in the current matter.

Section 2744.01 defines a "proprietary" function as:

(G)(1) 'Proprietary function' means a function of a political subdivision that is specified in division (G)(2) of this section;

(a) The function is not one described in division (C)(1)(a) or (b) of this section and is not one specified in division (C)(2) of this section;

(b) The function is one that promotes or preserves public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons.

Sub-section (G)(2) describes specific functions that are considered "proprietary," however, those specified functions are not relevant to the matter at hand.

▇▇▇ The Court, after reviewing the law review article cited by Defendants and the language of Chapter 2744 itself (as it relates to the definitions of governmental and proprietary functions), does not find that a function of a political subdivision must, necessarily, be either "governmental" or "proprietary." Consider the allegations in the instant matter. Distill the facts to their simplest form—namely, officials at the County morgue permitted a photographer to roam freely throughout the morgue and photograph the deceased with a variety of props with one of the goals to be the publication of a coffee table book. It is not difficult to find this action (function) outside the definition of a "governmental" function. It is not a function mandated by law; it is clearly not a function that "is for the common" good of all the people; and, it is a function not customarily engaged in by nongovernmental entities which serves to "promote or preserve the public peace, health, safety, or welfare." Ohio Rev.Code § 2744.01(C)(1)(a—c) (West 2004). In fact, the alleged actions seem more likely to be of a nature that derogates the "public peace, health, safety, or welfare" and the alleged actions definitely were not done for the common good of all inhabitants of the County.

Since the alleged activities were not "governmental" in nature then, according to Defendants, the actions must be "proprietary." However, the Court has already addressed how the alleged actions were not functions described in (C)(1)(a & b) or (C)(2) of section 2744.01. Thus, the definition of a "proprietary" function described in sub-section (G)(1)(a) is not applicable. Furthermore, the alleged actions do not fit into any of the specified "proprietary" functions found in sub-section (G)(2). Therefore, the only remaining definition of "proprietary" function that could circumscribe the alleged actions is found in sub-section (G)(1)(b). Yet, that definition requires that the alleged acts "promote or preserve" the "public peace, health, safety or welfare ..." Again, as noted above the actions, taken true as alleged, actually did the opposite.

Thus, the Court finds the Defendants' bold assertion that the acts of a political subdivision can only be "governmental" or "proprietary" incorrect. Clearly, acts can fall outside the definitions of "governmental" and "proprietary" as provided in Chapter 2744. Granted, Plaintiffs have not cited an Ohio case claiming that "governmental" and "proprietary" are not the only functions which a political subdivision can commit. Yet, neither have Defendants provided the Court with a case stating the opposite. What remains, then, is the opportunity (as noted in the law review article relied upon by Defendants) for the Court to judicially determine what is or is not "governmental" or "proprietary." *The Court will not base its decision on this analysis, despite the Court's reluctance to acknowledge Defendants argument that a political subdivision's activity can be only governmental or proprietary and nothing else. Instead, the Court will rely upon exceptions enunciated in Chapter 2744 in determining the County and individual*

**962**

*Defendants' lack of immunity (emphasis added ).*

An exception found in Section 2744.02(B)(4) reads as follows:

Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code.

Ohio Rev.Code § 2744.02(B)(4) (West 2004). This exception to Chapter 2744 immunity has been clarified by the Ohio Supreme Court. In *Hubbard v. Canton Bd. Of Educ.*, 97 Ohio St.3d 451, 780 N.E.2d 543 (2002), the court stated that this exception:

applies to all cases where an injury resulting from the negligence of an employee of a political subdivision occurs within or on the grounds of buildings that are used in connection with the performance of a governmental functions. *The exception is not confined to injury resulting from physical defects or negligent use of grounds or buildings.*

*Id.* at 547 (*emphasis added* ).

■ Section 2744.02(B)(4), read in conjunction with *Hubbard,* eliminates the County's immunity since the alleged actions occurred from the negligence of County employees on the grounds of a government building (here, the County morgue). *See Hubbard; Daniel v. Cleveland Mun. Sch. Dist.,* 2004 WL 1945688

(2004) (holding that section 2744.02(B)(4) "applies to all cases where an injury resulting from the negligence of an employee of a political subdivision occurs within or on the grounds of buildings that are used in connection with a governmental function"). As indicated above, the acts alleged occurred at the morgue—a government facility. The County, therefore, can not rely on the immunity provided by Chapter 2744.

■ An exception found in section 2744.03 of the Ohio Revised Code, serves to eliminate the immunity of the individual Defendants—specifically sub-sections 6(a & b). This particular sub-section reads:

(6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities . . .

Ohio Rev.Code § 2744.03(A)(6)(a & b) (West 2004). The actions of the individual County employees, if true, clearly "were manifestly outside the scope of the [their] employment or official responsibilities." *Id.* As such, the individual County employees, named as Defendants in this case can not claim immunity under Chapter 2744.

■ It is now established that the County is immune only for the intentional torts committed by its employees. As for claims based on negligence, "immunity attaches for neither the County nor the individual County employees named as Defendants . . ." (doc. 283).

As the above, extensive quotation from the Court's earlier Order clearly states,

the Court relied upon the exceptions found at Sections 2744.02(B)(4) and 2744.03(6)(a & b) to find the County liable for NIED and the individual County Defendants liable for IIED, NIED, and Civil Conspiracy not the unconstitutionality of Chapter 2744 or the "governmental/proprietary" distinction (doc. 283). However, the County does assert one other argument on this matter that the Court will address.

The County argues that since immunity attaches to it pursuant to the holding in *Wilson* for intentional torts, it cannot be held liable for the intentional torts of the individual County Defendants. The County cites, *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 639 N.E.2d 31 (1994), which states "[w]hile we agree that individual employees may be held liable for their malicious, bad faith, wanton or reckless act, R.C. 2744.03(A)(6) by its very terms applies only to individual employees and not to political subdivisions. It therefore has no effect on the liability of [the political subdivision]." *Fabrey* at 35; *See also Hodge v. City of Cleveland,* 1998 WL 742171, *5 (1998); *Nungester v. Cincinnati,* 654 N.E.2d 423, 427 (1995). The Court finds the holding in *Fabrey* to be correct. If the Court's previous ruling on this matter was unclear, it plainly reiterates that Plaintiffs' claim for IIED and Civil Conspiracy (i.e., the intentional torts) are dismissed as to the County.

▮▮▮▮ Plaintiffs' claim for Civil Conspiracy remains. The Court finds that genuine issues of material fact are in dispute that could lead a jury to conclude that the individual Defendants acted maliciously as required by Ohio law in conspiring to damage the Plaintiffs. However, the Plaintiffs claims for Unjust Enrichment and application of a Constructive Trust are dismissed. The Court simply does not find that Plaintiffs have provided sufficient evidence to withstand summary judgment on these claims. Plaintiffs have, at best, produced evidence that merely promotes speculation. Speculation can not withstand the burden required under Rule 56(c).

The Court does note that several of Plaintiffs' claims still remaining barely withstand the summary judgment standard. This is especially true in relation to the claims of Sub–Class 2. The Plaintiffs' case, in regards to Sub–Class 2, stands on the edge—far enough from the edge to withstand summary judgment, but just barely. The Court finds, as discussed above, that genuine issues of material fact exist in this matter sufficient to require a jury to decide. However, if after both Parties have presented all of their evidence and upon Motion for Judgment as a Matter of Law, the Court finds that Plaintiffs have not made a sufficient showing to prove an essential element of the case, it will not hesitate to grant such a motion.

**CONCLUSION**

For the above stated reasons, the Motion for Summary Judgment of Parrott is DENIED (doc. 315), the Motion for Summary Judgment of the County is DENIED IN PART AND AFFIRMED IN PART (doc. 321). Condon's Motion for Summary Judgment is DENIED (doc. 325). And, lastly, Tobias' Motion for Summary Judgment is DENIED (doc. 327). In Order to assist the Parties in preparing their Final Pre–Trial Order necessary for the upcoming Final Pre–Trial Conference scheduled for Thursday, October 6, 2005 at 10:00 A.M., the Court recites the claims remaining in this action. First, Defendant Ronda Gros is DISMISSED from this matter. Second, Plaintiffs' Claims for Unjust Enrichment and application of a Constructive Trust are DISMISSED. Third, a Section 1983 Civil Rights claim remains against the County and the individual Defendants. Fourth, A claim for Negligent Infliction of Emotional Distress remains against the

County and the individual Defendants. Fifth, a claim for Intentional Infliction of Emotional distress remains against the Defendants individually but not the County. Finally, a claim for Civil Conspiracy remains against the individual Defendants. Additionally, Plaintiffs' earlier filed Motion to Certify Defendants' Appeal as Frivolous (doc. 241) is DENIED as MOOT.

SO ORDERED.